DECISION.
{¶ 1} Defendant-appellant Michael Carson shot William Christopher Wilson in an apartment in front of two witnesses. Wilson managed to run out of the apartment building, but collapsed in an alley and soon died. Carson now appeals his convictions for aggravated murder with a firearm specification and having a weapon while under a disability. We affirm.
 I. The Shooting {¶ 2} On June 24, 2003, John Kirk worked a full day as a roofer and came home to his apartment on Grand Avenue. Kirk testified that he kept his house "open" to the public, and that people would come and go throughout the day. When he got home, Tyrone White and Carson, known to his friends as "Country," were already there. Later in the evening, four people were in the apartment — Kirk, White, Carson, and Wilson.
 {¶ 3} Kirk testified that he was on the balcony off the kitchen drinking a beer when he heard Wilson say, "Quit playing." Kirk looked to see what Wilson was talking about. He saw Wilson sitting at the kitchen table with Carson standing beside him. Carson had a gun. Kirk saw Carson hold the gun up to the right side of Wilson's head. Wilson did not appear alarmed or angry, but he waved his hand to push the gun away and told Kirk to tell Carson to quit playing.
 {¶ 4} Kirk testified that he came into the kitchen and told Carson to quit playing around. He said that Carson replied, "Do you think I'm playing?" Carson lowered the gun to his side, out of Kirk's line of sight. Immediately after that, Kirk heard a gunshot. Wilson said, "Oh shit," jumped up from the table, and ran towards the front door of the apartment. Kirk testified that Carson followed Wilson and shot at Wilson again as both Wilson and Carson ran out of the apartment.
 {¶ 5} White's testimony about the shooting was similar to Kirk's. White testified that while he was sitting in the living room watching television, he heard Wilson say, "Stop playing." White could see into the kitchen, and he looked up to see Carson holding a gun to Wilson's head. White saw Wilson reach up with his right hand and push the gun away from his head. Wilson again said, "Stop playing."
 {¶ 6} According to White, Carson said, "Do you think I'm playing?" Carson then lowered the gun and shot Wilson directly in the stomach. Wilson said, "Oh my God," jumped up, and ran towards the door of the apartment. White testified that as Wilson approached the front door, Carson fired another shot at him. Wilson ran out of the apartment. Carson paused and then ran out also.
 {¶ 7} White testified that he had seen Carson arrive at Kirk's apartment that evening in his maroon Grand Am. He also testified that, before the shooting, Wilson had been teasing Carson about a woman. Apparently Wilson and Carson had had a feud over a woman about a year earlier. White said that it was common knowledge in the neighborhood that at one time there had been some bad blood between Wilson and Carson. But despite the feud and the teasing, White said that there had been no discernible tension or anger between the two men that evening before the shooting.
 {¶ 8} Kirk testified that, after Wilson and Carson ran out of the apartment, he did not realize that Wilson had been shot. White asked Kirk if he needed him to stay. Kirk told him no, and White left.
 {¶ 9} Believing that Carson had shot the gun into the kitchen floor, Kirk began looking around for a hole in the floor. He did not find one. He then looked and found a hole in his living-room wall. The hole was in the direction that Carson had fired his second shot. He looked outside and saw Wilson's car still parked on the street, but he did not see Carson's car.
 {¶ 10} Kirk testified that he then straightened up the kitchen and headed into the basement of the apartment building next door to fix a faulty water heater. About twenty minutes later, as he returned to his apartment from the basement, police stopped and questioned him. It was then that Kirk realized that Wilson had been shot.
 {¶ 11} The police took Kirk to the police station, and he told them about all that had happened that evening. He said that a man named Country had a gun and had shot at Wilson. Several days later, police showed Kirk a photo lineup of six individuals. Kirk identified Carson as Country, the person who had shot at Wilson.
 {¶ 12} White testified that, after asking Kirk if he needed him to stay, he headed out to find Wilson. As he left the building, he saw Carson rush to his Grand Am and drive off. Seeing Wilson's car still parked on the street, White asked two neighbors, Ricardo and Chili, if they had seen Wilson. They told him that Wilson was in the alley. White told them to call 911.
 {¶ 13} White headed down the alley and found Wilson lying on his stomach, gasping for air. According to White, Wilson told him to take his keys and his phone. As White attempted to turn Wilson over onto his back, Ricardo appeared. Ricardo asked if White had shot Wilson and started grabbing at White. White testified that he panicked and ran away.
 {¶ 14} White hid in a park for several hours. He finally answered Wilson's cellular phone when he recognized the number of Wilson's friend AZ. AZ was at the hospital with the police and told White that Wilson had died. A police officer then talked to White on the phone and convinced him to come directly to the police station to make a statement.
 {¶ 15} White told the police that the man named Country had shot Wilson. The next day, the police showed White a photo lineup, and he identified Carson as Country, the person who had shot Wilson.
 {¶ 16} Kimberly Flores lived in the apartment building next to Kirk. She testified that, before the shooting, she knew both Wilson and Carson by sight but did not know their names. She knew that Carson normally drove a reddish Grand Am. On the night of the shooting, she was sitting on her front porch with some friends and family. She saw Wilson come out of the building next door, holding his stomach and breathing heavily. Wilson headed into the alley between the two buildings.
 {¶ 17} Flores testified that several people then came out of the building next door. She said that Carson ran to his car and drove away. White also came running out and told them that Wilson had been shot. White asked her to call 911, which she did.
 {¶ 18} About a month later, a police officer interviewed Flores. He showed her a photo lineup of six individuals. Flores picked out Carson as the person she had seen running out of the building and driving off in the reddish Grand Am.
 {¶ 19} Dr. Daniel Schultz performed the autopsy on Wilson. He testified that Wilson had an entrance gunshot wound in his right abdomen. He explained that it was a contact wound, meaning that the barrel of the gun was in contact with Wilson's body or his clothing when the shot was fired. Schultz further testified that Wilson had an exit wound on the left side of his body. An x-ray revealed that there was no bullet remaining in Wilson's body. Schultz testified that Wilson had died of shock due to perforations in the aorta and the intestinal tract caused by the gunshot wound to the abdomen.
 {¶ 20} In his defense, Carson theorized that Kirk and White had conspired to rob and kill Wilson and to let him take the blame. Carson presented testimony from Michael Trimpe, a trace-evidence examiner. Trimpe testified that tests revealed that both Kirk and White had gunpowder residue on their hands the night Wilson died. On cross-examination, Trimpe acknowledged that having gunshot residue on the hands did not necessarily mean that a person had fired a gun. He said that a person could get gunshot residue on the hands by being present when a gun was shot or by touching something in the vicinity of the gunshot.
 II. Sufficiency and Manifest Weight {¶ 21} In his first three assignments of error, Carson argues that his convictions were not supported by sufficient evidence, that they were against the manifest weight of the evidence, and that the trial court erred when it denied his Crim.R. 29 motion for acquittal.
 {¶ 22} In criminal cases, the legal concepts of sufficiency of the evidence and weight of the evidence are distinct.[1] A challenge to the sufficiency of the evidence attacks the adequacy of the evidence presented. Whether the evidence is legally sufficient to sustain a conviction is a question of law.[2] The relevant inquiry in a claim of insufficiency is whether any rational factfinder, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proved beyond a reasonable doubt.[3]
 {¶ 23} A challenge to the weight of the evidence attacks the credibility of the evidence presented.[4] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[5] The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[6]
 {¶ 24} Carson was convicted of aggravated murder and of having a weapon while under a disability. To prove aggravated murder, the state had to establish that Carson had purposely, and with prior calculation and design, caused Wilson's death.[7] To prove that Carson had a weapon while under a disability, the state had to establish that Carson had knowingly acquired, had, carried, or used a firearm or dangerous ordnance while under indictment for or while having been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.[8]
 {¶ 25} The state offered two witnesses who testified that Carson held a gun to Wilson's head. When told to "stop playing," Carson asked, "Do you think I'm playing?" Kirk testified that Carson then lowered the gun and shot it. White testified that Carson pointed the gun directly at Wilson's stomach and fired. Both Kirk and White testified that Carson fired an additional shot at Wilson as he ran out of the apartment. The coroner testified that Wilson died from a contact gunshot wound to his abdomen.
 {¶ 26} We conclude that any rational factfinder, viewing the evidence in a light most favorable to the state, could have found beyond a reasonable doubt that Carson had committed aggravated murder. Therefore, sufficient evidence supported Carson's murder conviction with the firearm specification, and his Crim.R. 29 motion was properly denied.
 {¶ 27} Carson chose to have the trial court, and not the jury, determine his guilt for the weapon-under-disability charge. The state presented evidence to the court that Carson had been convicted of drug trafficking in 2002. The evidence presented at trial established that Carson had used a gun to kill Wilson. We conclude that Carson's conviction for having a weapon while under a disability was supported by sufficient evidence.
 {¶ 28} Carson, through his counsel, presented his theory to the jury that Kirk and White had conspired to rob and kill Wilson and then to blame Carson for it. In addition, the cross-examinations of Kirk and White revealed that Kirk had two previous convictions for theft and a conviction for felonious assault, and that White had been convicted of burglary and receiving stolen property.
 {¶ 29} But Carson's theory that Kirk and White had killed Wilson was extremely speculative. Despite the elaborate scenario suggested by Carson's counsel to explain how Kirk and White had devised and carried out their plan, there was little or no evidence presented to the jury that supported the theory. And it was for the jury to weigh Kirk's and White's credibility. Our review of the record does not persuade us that the jury clearly lost its way or created a manifest miscarriage of justice in finding Carson guilty of aggravated murder.
 {¶ 30} Therefore, we overrule Carson's first three assignments of error.
 III. Identification {¶ 31} In his fourth assignment of error, Carson argues that the identification made by Flores should have been suppressed.
 {¶ 32} Before his trial, Carson moved to suppress all identification testimony, and the court held a suppression hearing. Cincinnati police officer Matt Thompson testified that, about a month after the shooting, he interviewed Flores. Flores told Thompson that she had heard what she thought were fireworks and then had seen several people run out of the building at almost the same time. She said that one headed into the alley, while another got in the reddish Grand Am and drove away. She said she knew both men by sight, but did not know the name of either one at the time.
 {¶ 33} Thompson showed Flores the photo lineup of six individuals. He asked her to point to the person she had seen run out of the building and drive away. Flores picked out Carson.
 {¶ 34} When a witness confronts a suspect before trial, due process requires a court to suppress an identification of the suspect if the confrontation is unnecessarily suggestive of the suspect's guilt and the identification is unreliable under all the circumstances.[9] An identification does not violate due process when it is the result of observations made at the time of the crime and does not stem from an impermissibly suggestive confrontation.[10]
 {¶ 35} Carson argues that Flores identified Carson due to suggestive police techniques. He also contends that because Flores identified him over a month after the shooting, her identification was unreliable.
 {¶ 36} Carson does not specify how the identification was tainted by suggestive police techniques. Thompson testified that he simply presented the photo array to Flores and gave her time to look it over carefully. He testified that he did not emphasize one photo over another, and that Flores was quite sure that Carson was the one she had seen run out of the building and get in the red car.
 {¶ 37} As for the time between the shooting and Flores's identification, the length of time between the crime and the confrontation is merely one factor affecting reliability.[11] Other factors include the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, and the level of certainty demonstrated by the witness at the confrontation.[12]
 {¶ 38} Flores told Thompson that, before the shooting, she knew Carson by sight and knew that he drove a reddish Grand Am. Even though it was over a month after the shooting, Thompson testified that Flores was "very clear" that Carson was the one who had run out of the building and driven off. Furthermore, Flores identified Carson at trial as the man she had seen in the neighborhood before the shooting and who had run out of the building and driven away the night of the shooting.
 {¶ 39} We conclude that there was no suggestiveness by the police. We also conclude that, under all the circumstances, the identification was reliable. Therefore, Carson's motion to suppress was properly denied, and we overrule his fourth assignment of error.
 IV. Batson Challenge {¶ 40} In his next assignment of error, Carson claims that the trial court improperly allowed the prosecution to dismiss one of two black prospective jurors.
 {¶ 41} In Batson v. Kentucky, the United States Supreme Court held that the prosecution can not use its peremptory challenges to purposefully discriminate by excluding members of a minority group from a jury.[13] The court established a three-step procedure for evaluating claims of racial discrimination in peremptory strikes.
 {¶ 42} First, the opponent of the strike must make a prima facie showing of discrimination. Second, the proponent must give a race-neutral explanation for the challenge. Third, the trial court must determine whether, under the circumstances, the opponent has proved purposeful racial discrimination.[14] A trial court's finding of no discriminatory intent "will not be reversed on appeal absent a determination that it was clearly erroneous."[15]
 {¶ 43} During voir dire, defense counsel asked the jury, "[The prosecutor] said this is not like CSI, and it is not. And everybody watches CSI because everybody raised their hand. So, Mr. Covington, as [the prosecutor] said, there is not a lot of trace evidence. And in your mind does that excuse them from their burden of proof?" Prospective juror Covington responded, "Not at all." Defense counsel continued, "Okay. How about you, Mr. Benton?" Prospective juror Benton responded, "I think there ought to be some more."
 {¶ 44} The state exercised a peremptory challenge to dismiss prospective juror Benton. The defense made a Batson challenge, and, without prompting, the prosecutor gave his reason for removing the juror. He stated, "The reason for my removal of that juror * * * is his last answer to [defense counsel]'s question. I know this is a case where there isn't going to be a whole lot of physical evidence. Basically he said if there is not a lot of physical evidence he's going to require more from the State. And, basically, he said he's going to hold the State to a higher burden."
 {¶ 45} The trial court accepted the state's reason as race-neutral and allowed prospective juror Benton to be dismissed. We agree that the state's reason for dismissal was race-neutral and that Carson did not prove purposeful discrimination. Benton's thoughts on how much proof the state should be required to produce had nothing to do with his race. And concern that he would hold the state to a higher burden of proof was a legitimate reason for the state to want to keep him off the jury.
 {¶ 46} Therefore, the trial court's decision was not clearly erroneous, and we overrule Carson's fifth assignment of error.
 V. Howard Charge {¶ 47} In his final assignment of error, Carson argues that the trial court's Howard charge to the jury was premature and was not verbatim.
 {¶ 48} The Howard charge is a supplemental instruction for the trial court to give to a jury when the jury is deadlocked in its deliberations.[16] To avoid the pitfall of coercing a guilty verdict from an otherwise deadlocked jury, the supplemental jury instruction must advance two goals: it "must encourage a verdict where one can conscientiously be reached," and it "must be balanced, asking all jurors to reconsider their opinions in light of the fact that others do not agree."[17]
 {¶ 49} On the first day of deliberations, the jury deliberated for about three hours. The jury then asked the court, "If the jury cannot come to a unanimous decision — what do we do? How long do we deliberate?" The court responded, "Well, you have only actually been deliberating about three hours, which really is not all that long. So, we will be bringing you back on Tuesday. We have already gone over that. That's not a problem. It is a little early for that."
 {¶ 50} A juror asked for further clarification of the issue, stating, "We were aware of the time that we spent today and it wasn't applied to today. We knew we were coming back on Tuesday. But we wondered if after days of deliberations and discussions and not coming to an agreement, when could you start then wondering then what happens?"
 {¶ 51} The court responded, "Don't worry about that yet. You put the cart before the horse. You will be surprised." The court told the jurors not to think about the case over the weekend and to start fresh on the following Tuesday. The court continued, "And then I'll have another charge — well, I'll let you deliberate for awhile on Tuesday and then there is another charge I might read you. At that point if you still haven't reached a verdict it is really early. * * * So, don't worry about how many days it will be."
 {¶ 52} On the following Tuesday, the jury deliberated for another four hours. The court then read the Howard charge to the jury. The court noted on the record that it read the charge directly from the Howard opinion. The jury deliberated about three hours more on Tuesday and for three hours on Wednesday. After about an hour on Thursday, the jury reached its verdict.
 {¶ 53} Carson argues that a Howard charge given after seven hours of deliberations was premature. We disagree.
 {¶ 54} "Whether a jury is irreconcilably deadlocked is a necessarily discretionary determination for the trial court to make."[18] We will not reverse the trial court's determination absent an abuse of discretion.
 {¶ 55} The Ohio Supreme Court has held that a trial court acted appropriately by giving the Howard charge after four and one-half hours of deliberations.[19] Numerous Ohio appellate cases have approved of giving the Howard charge after seven hours of deliberations — if not less.[20]
 {¶ 56} In State v. Ballew, we affirmed when the trial court had given the Howard charge after seven and one-half hours of deliberations.[21]
In that case, we also noted approvingly that the trial court had not proceeded straight to the Howard charge at the jury's first mention of deadlock three and one-half hours into its deliberations. The court allowed the jury to deliberate another four hours before giving theHoward charge.
 {¶ 57} The court in the present case similarly did not rush to give the Howard charge at the first sign of possible deadlock. The court encouraged the jury to continue deliberating. After another four hours of deliberations, the court finally gave the supplemental charge. We are convinced that the trial court handled the deliberations appropriately — it was not an abuse discretion to give the Howard charge when it did.
 {¶ 58} As for Carson's claim that the trial court did not read theHoward charge verbatim, the court noted on the record that it read the charge straight from the Howard opinion. Any differences were trivial at best. In formulating the Howard charge, the Ohio Supreme Court has stated that the supplemental instruction must not be coercive.[22] Numerous Ohio courts have held that a trial court is not required to give a verbatim Howard charge, as long as the changes do not coerce the jury into a finding of guilt or innocence.[23]
 {¶ 59} We conclude that there was nothing coercive about any of the minor differences from the verbatim Howard charge. Therefore, we overrule Carson's sixth assignment of error and affirm the trial court's judgment.
Judgment affirmed.
Doan, P.J., and Sundermann, J., concur.
[1] See State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
[2] Id.
[3] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[4] See State v. Thompkins, supra, at 387.
[5] See id.; State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717.
[6] See State v. Martin, supra.
[7] R.C. 2903.01(A).
[8] R.C. 2923.13(A)(3).
[9] See State v. Waddy (1992), 63 Ohio St.3d 424, 438, 588 N.E.2d 819.
[10] See State v. Davis, 76 Ohio St.3d 107, 112, 1996-Ohio-414,666 N.E.2d 1099.
[11] See State v. Moody (1978), 55 Ohio St.2d 64, 67, 377 N.E.2d 1008, citing Neil v. Biggers (1972), 409 U.S. 188, 199, 93 S.Ct. 375.
[12] Id.
[13] See Batson v. Kentucky (1986), 476 U.S. 79, 106 S.Ct. 1712.
[14] See Batson, supra, at 96-98; Purkett v. Elem (1995), 514 U.S. 765,767-768, 115 S.Ct. 1769; State v. White, 85 Ohio St.3d 433, 436,1999-Ohio-281, 709 N.E.2d 140.
[15] See State v. Hernandez (1992), 63 Ohio St.3d 577, 583,589 N.E.2d 1310, citing Hernandez v. New York (1991), 500 U.S. 352, 369,111 S.Ct. 1859.
[16] See State v. Howard (1989), 42 Ohio St.3d 18, 537 N.E.2d 188.
[17] Id. at 25.
[18] See State v. Gapen, 104 Ohio St.3d 358, 2004-Ohio-6548,819 N.E.2d 1047, at ¶ 127.
[19] See State v. Mason, 82 Ohio St.3d 144, 167, 1998-Ohio-370,694 N.E.2d 932. See, also, State v. King (Mar. 22, 2000), 7th Dist. No. 95 CA 163.
[20] See State v. Martens (1993), 90 Ohio App.3d 338, 343,629 N.E.2d 462; State v. Watley (June 26, 1998), 1st Dist. No. C-970452;State v. Samples (Dec. 24, 1996), 1st Dist. No. C-960241.
[21] See State v. Ballew (Feb. 26, 1999), 1st Dist. No. C-980442.
[22] See State v. Howard, supra, at 23-24.
[23] See State v. Lewis, 8th Dist. No. 82055, 2003-Ohio-5240, at ¶¶ 10-13; State v. Stidham, 5th Dist. No. 03CA000022, 2004-Ohio-4206, at ¶ 44; State v. Matyas, 7th Dist. No. 98-JE-14, 2000-Ohio-2671.