[Cite as *State v. Bandedo*, 2017-Ohio-1301.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2016-CA-5 |
| | : | |
| v. | : | Trial Court Case No. 15-CR-152 |
| | : | |
| TONY BANDEDO | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of April, 2017.

. . . . . . . . . . .

R. KELLY ORMSBY,III, Atty. Reg. No. 0020615, by DEBORAH S. QUIGLEY, Atty. Reg.
No. 0055455, Darke County Prosecutor's Office, Courthouse, Greenville, Ohio 45331
        Attorney for Plaintiff-Appellee

P.J. CONBOY II, Atty. Reg. No. 0070073, Staton, Fisher, & Conboy, LLP, 5613 Brandt
Pike, Huber Heights, Ohio 45424
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

HALL, P.J.

{¶ 1} Tony Bandedo appeals from his conviction for arson. Finding no error, we affirm.

## I. Background

{¶ 2} In March 2013, Bandedo bought a 2012 Toyota Camry for a purchase price of a little more than $27,000. As part of the transaction, he traded in his pickup truck which still had an outstanding loan balance of over $9,000. His new loan balance on the Camry was just over $37,000 with a monthly payment of $649.50 for 72 months. He also paid for "gap" insurance.[1] On December 8, 2013 at around 5 p.m., Bandedo parked the car behind the restaurant that he managed and went to work. Less than two hours later, someone took the car using the valet key in the glove box, drove the car out to the middle of nowhere, doused the passenger compartment with gasoline, and set the car on fire. The car was not reported to have been used to commit a crime, and nothing of value was taken from the car. The insurance company refused to cover the loss. Not long after, an informant told police that he believed that Bandedo hired someone to torch the car to get out of paying for it. The informant helped police collect evidence against Bandedo by surreptitiously recording two conversations with him.

{¶ 3} Bandedo was indicted in July 2015 on one count of arson under R.C. 2909.03(A)(4). The case was tried to a jury. Bandedo took the stand in his own defense and adamantly denied hiring someone to torch the car. While the jury was deliberating it sent a note to the trial judge saying that it was split 6-6. With the consent of counsel, the

---

[1] Guaranteed Auto Protection (GAP) insurance covers the difference between the actual cash value of a vehicle and the balance still owed on the financing.

court instructed the jury to make continued efforts to reach a verdict, if it could conscientiously do so, encouraging each juror to reevaluate his or her position. The jury resumed deliberating, and a short time later it returned a unanimous verdict of guilty. The trial court sentenced Bandedo to five years of community control.

{¶ 4} Two weeks after the jury returned its verdict, Bandedo filed a motion for a judgment of acquittal or, in the alternative, a motion for a new trial. The trial court denied both motions.

{¶ 5} Bandedo appealed.

## II. Analysis

{¶ 6} Bandedo presents two assignments of error for our review. The first challenges the sufficiency and weight of the evidence. And the second assignment of error challenges the overruling of his motion for a new trial.

### A. *Evidentiary challenges*

{¶ 7} Bandedo was convicted of arson under R.C. 2909.03(A)(4), which pertinently states:

(A) No person, by means of fire or explosion, shall knowingly do any of the following:

* * *

(4) Cause, or create a substantial risk of, physical harm, through the offer * * * of an agreement for hire or other consideration, * * * to any property of the offender * * * with purpose to defraud[.]

{¶ 8} There is no dispute that Bandedo's car was destroyed by arson. The question is whether Bandedo hired someone to do this to get out of paying for it.

{¶ 9} "A challenge to the sufficiency of the evidence supporting a conviction requires that we consider 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, _N.E.3d_, ¶ 74, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "We will not 'disturb a verdict on appeal on sufficiency grounds unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." ' " *Id.*, quoting *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997).

{¶ 10} The State's theory was that Bandedo hired someone to torch the car to get out of paying for it. A forensic expert examined the burned out car and testified that there was no sign of forced entry and that the valet key had been used, which Bandedo confirmed had been in the glovebox. The expert also said that none of the items of value that are often stolen from cars was taken from Bandedo's car before it was torched. Another expert testified that traces of gasoline were found in the front of the passenger compartment. The evidence suggests that Bandedo hired Kenny Kniess to get rid of the car. Kniess was questioned by police but was never charged and was not called as a witness to testify. But phone records show that Bandedo contacted Kneiss twice on the day the car was torched—at 1:59 p.m., when Bandedo left the restaurant on a break, and at 5:53 p.m., after Bandedo had returned. The first report of the car fire came into the fire department at 7 p.m.

{¶ 11} It was Steve Osterholt, an ostensible friend of Bandedo, who tipped off the

police and collected evidence against Bandedo. Osterholt had worked for Bandedo at the restaurant bussing tables. Osterholt testified that Bandedo had told him that the payments on the car were "kind of steep" and "really high." (Tr. 354). Osterholt said that in late November 2013 Bandedo had offered him $300 to take the car and burn it. Osterholt refused, but when he later heard that the car had been taken and torched, he suspected that Bandedo had set it up. In 2014, Osterholt went to the police with his suspicion. The police asked him to wear a wire while talking to Bandedo and to try to get Bandedo to implicate himself. Osterholt agreed, and in August, a wired-up Osterholt went to the restaurant. An audio recording of Osterholt's conversation with Bandedo at the restaurant was played for the jury, and the State provided a written transcript, which was admitted as an exhibit (State's Exhibit 30a) but not given to the jury.

{¶ 12} In the recorded conversations Bandedo never explicitly confesses, but some of his statements are suggestive. In this exchange, he admits that what happened to the car was his fault:

[Osterholt] * * * I was looking at another Toyota (inaudible) the luck we have with Toyotas, I mean.

[Bandedo] My Toyota was my own fault but. They sure did. They denied my claim. I don't know.

[Osterholt] Do you regret doing it?

[Bandedo] Yeah. I'm still paying for it, yeah.

(State's Exhibit 30a, 8; Tr. 544). Here, Bandedo says that Kniess better not say anything to his (Kniess's) girlfriend or to anyone else:

[Osterholt] * * * Kenny's back, (inaudible) I'm surprised he hasn't

[Bandedo] I hear he's back with Annette

[Osterholt] You're kidding me.

[Bandedo] That's what I heard. I heard he's been walking around with her. He's back with her.

[Osterholt] Well hopefully he doesn't say s*** to her because you know how big her f***** mouth is.

[Bandedo] If he's smart, if he's real smart cause as much as they get into it, he better just keep his mouth shut. To everybody.

(State's Exhibit 30a, 9; Tr. 545). This exchange suggests that Kniess torched the car using "regular" gasoline:

[Osterholt] From them pictures f******, he did a good job.

[Bandedo] Oh man. It was, it was gone. I mean I still don't see how they get of

[Osterholt] Claiming you

[Bandedo] How they can, they're basically trying to say (inaudible) is what they're saying.

[Osterholt] I don't even know what the f*** he used.

[Bandedo] I know what he used.

[Osterholt] Regular?

[Bandedo] Yeah, regular.

(State's Exhibit 30a, 9-10; Tr. 545-546). And here Bandedo appears to be saying that he paid Kniess to do the deed:

[Osterholt] You paying him what you were paying me? $300.00? Or

did he charge you more?

[Bandedo] Do what?

[Osterholt] Did he charge you more?

[Bandedo] (inaudible)

[Osterholt] Just 300.

(State's Exhibit 30a, 10). They then discussed photos of the burned car that Bandedo was showing Osterholt:

[Osterholt] Where was it done at? Out of town right?

[Bandedo] Out towards ah Versailles.

[Osterholt] So, a longer response time for the fire fighters to get there.

[Bandedo] Obviously it was already completely gone by the time they got there. From the looks of this it was already gone. What I can't get over is there not being a steering column in there.

[Osterholt] Maybe Kenny wanted it as a souvenir. And when I was reading that report I mean, it said in there about the glass. But there was none out there.

(State's Exhibit 30a, 14; Tr. 547). Finally, this exchange suggests that Bandedo wished he had not tried to get rid of the car:

[Osterholt] So did you learn your lesson?

[Bandedo] Hell yeah, I ain't never doin this s*** again.

[Osterholt] (inaudible) think about it.

[Bandedo] You never know. You didn't know until I tried it. I had no, I would never in a million years thought it went the way it did though. So

much f***** interrogation and all that b*******.

[Osterholt] You still got to pay for it.

[Bandedo] If I don't pay for it they ruin my credit and then I can never get anything else.

(State's Exhibit 30a, 19-20; Tr. 548-549, 550).

{¶ 13} In September 2014, a few weeks after the conversation at the restaurant, Bandedo was called to the Darke County Sheriff's Office where the police told him that they had him on tape talking about hiring someone to torch the car. From the sheriff Bandedo drove straight to Osterholt's home to look at Osterholt's car. Osterholt surreptitiously recorded their conversation with his cell phone. An audio recording of this conversation was also played for the jury, and the State provided a written transcript, which was also admitted as an exhibit but not given to the jury. Bandedo told Osterholt that the police told him that they had him on tape confessing to hiring someone to torch his car. He was upset that someone had talked and said that he had only told three people what happened to the car—his girlfriend, his wife, and Osterholt. They then discuss who would have taped Bandedo. And they talked about what could happen to Bandedo, including the possibility of probation or jail. Bandedo's statements here are less incriminating than in the first recorded conversation.

{¶ 14} Viewing this evidence in the light most favorable to the State, we believe that a reasonable person could find that Bandedo hired someone to set the car on fire to avoid making further payments.

{¶ 15} We review whether the manifest weight of the evidence supports the jury's findings by a different analysis. "In contrast [to a sufficiency challenge], a manifest-weight

challenge 'concerns "the inclination of the *greater amount of credible evidence* * * * to support one side of the issue rather than the other." ' " (Emphasis sic.) *Montgomery*, 2016-Ohio-5487, at ¶ 75, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "A manifest-weight challenge requires us to consider the entire record, including the credibility of the witnesses, the weight of the evidence, and any reasonable inferences and determine whether ' "the [jury] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." ' " *Id.*, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). We will not substitute our judgment for that of the jury on the issue of witness credibility "unless it is patently apparent that the [jury] lost its way in arriving at its verdict." *State v. White*, 2d Dist. Montgomery No. 20324, 2005-Ohio-212, ¶ 67.

**{¶ 16}** At trial, Bandedo testified in his own defense. He offered innocent explanations for his statements in the first conversation, complaining that during the conversation Osterholt is "bouncing all over the place. It would go from one thing to the next, back and forth all the way through here." (Tr. 550). He said that when he admitted that what happened to the car was his fault and that he regretted doing it, he was referring to the fact that he left the valet key in the glove box, which allowed the person to easily take the car. The comments about Kniess not saying anything to his girlfriend, said Bandedo, refer to the fact that the girlfriend had been causing trouble for the restaurant (the nature of which is unclear from the testimony). So Bandedo was saying that Kniess should not tell her anything about the restaurant and how it operates. As to his statements suggesting that "regular" gasoline was used to torch the car, Bandedo explained that he

was working in the restaurant during the conversation with Osterholt and that "regular" refers to regular—not diet—soda. Bandedo also explained his statements that seem to suggest that he paid Kniess to torch the car. Bandedo pointed out that right before this exchange Osterholt was talking to Bandedo's son, who was also working in the restaurant bussing tables—the same job that Osterholt had when he worked there. Bandedo testified that he thought Osterholt was asking whether he was paying his son the same amount that he paid Osterholt for bussing tables. Bandedo had earlier testified that Osterholt was paid "a little over $300 every two weeks." (*Id.* at 487). Bandedo explained his response to Osterholt's question about whether he had learned his lesson this way:

> Okay. What you're missing out on that is when you're leading up to this, you're also forgetting I'm outside looking at his car. I am shaking a wheel, the wheel on tire in the car, telling me about the front end of his car. He shows me—he held my hand underneath the exhaust. My hands are dirty. I'm looking down. I'm dressed as I am right now and my hands are dirty. I got to go back to work. This is where he makes the comment do you regret it? I said, yes. I would never know until I was trying it.

(*Id.* at 549). With respect to the evidence that he had called Kniess twice the day the car was torched, Bandedo testified that he called because Kniess was taking some time off to care for his ill mother and Bandedo needed to know whether he was coming back to work. Bandedo also testified that he had Christmas gifts in the back seat of the car. Finally, Bandedo pointed out that he was paying his bills at the time the car was torched and continued to pay the loan on the car for some time after.

{¶ 17} Our review of the audio recordings played at trial reveal that, in the first

recording, the restaurant is quite busy and that Bandedo is trying to both serve customers and talk to Osterholt. And Bandedo is correct that Osterholt's questions and statements skip around to different topics, "trying to make it to what he needs it to be," (*id.* at 550), as Bandedo says. Many of the explanations of his statements that he offers could be plausible, and it is true that many of Bandedo's statements could bear an innocent interpretation.

{¶ 18} Nevertheless, "[t]he credibility of the witnesses and the weight to be given to their testimony were matters for the trier of facts to resolve." *White*, 2005-Ohio-212, at ¶ 69. "The jury in this case did not lose its way simply because it chose to believe the State's witnesses and disbelieve Defendant, which is was entitled to do." *Id.* And "[t]he fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." (Citation omitted.) *State v. Brown*, 2d Dist. Montgomery No. 24541, 2012-Ohio-1848, ¶ 59. Whatever his motivation, Osterholt testified that Bandedo told him that the car payments were "steep" and that Bandedo offered him $300 to take the car and burn it. We note too that less than two hours elapsed from the time that the car was taken to the time that it was torched. There was no sign of forced entry, nothing was taken from the car, and the car was not used in another crime. The evidence does not explain why a person would steal the car, drive it straight to a spot in the middle of nowhere, douse the inside with gasoline, and light it on fire. When considering Bandedo's recorded statements in the context of the other evidence—and lack of evidence—the jury reasonably could have given the statements a guilty interpretation. We cannot say that it is patently apparent that the jury lost its way in finding that Bandedo hired someone to torch his car to get out of paying for it.

{¶ 19} The first assignment of error is overruled.

B. *Motion for a new trial*

{¶ 20} The second assignment of error alleges that the trial court erred by overruling Bandedo's motion for a new trial.

{¶ 21} Two weeks after the jury rendered its verdict, Bandedo filed a motion for judgment of acquittal under Crim.R. 29 or, alternatively, a motion for a new trial under Crim.R. 33. Bandedo argued, among other things, that the evidence is insufficient and that when the jury reported it was split, the court should have declared a mistrial. The trial court overruled both motions. It found no merit to the insufficiency argument. And as to the mistrial argument, the court pointed out that both attorneys agreed to have the court give a mild *Allen* charge and then to return the jury for further deliberations. The court found nothing wrong with the charge that it gave. It further found that the length of time that the jury had been deliberating was not so long as to be unduly tiring. The court noted that the jury did not resist the *Allen* charge and did not indicate that it was deadlocked or that it was unable to reach a unanimous verdict.

{¶ 22} Under Crim.R. 33, a new trial may be granted for several reasons, including an "[i]rregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial" and "[t]hat the verdict is not sustained by sufficient evidence or is contrary to law." Crim.R. 33(A)(1) and (4). Bandedo argues on appeal that the evidence is insufficient and that the jury's 6-6 position was an irregularity that required a new trial.

{¶ 23} The jury began deliberating around 10:10 a.m., and around 4:25 p.m. it sent the trial judge a note saying, " 'We are 6-6. Everyone is dug in. Everyone is   very

adamant.' " *Judgment Entry*, 2 (Apr. 28, 2016), citing Court Exhibit #4; (Tr. 623). As the trial court recounted in its ruling, "With the agreement of counsel, the jury was brought back into the courtroom where a 'softened' version of the *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 LE 528 (1896), 'dynamite charge' was given and deliberations continued. See Ohio Jury Instruction CR 429.09." *Id.* Bandedo did not object to the charge after it was given, despite being given the opportunity to do so. At 5:08 p.m., the jury reached its unanimous guilty verdict.

**{¶ 24}** Because Bandedo agreed to the giving of the charge and did not object to the language of the charge, he has forfeited any claim of error with respect to it, unless the outcome of the proceedings would have been different but for the charge. *See State v. Helm*, 2016-Ohio-500, 56 N.E.3d 436, ¶ 18 (1st Dist.); *State v. Rhines*, 2d Dist. Montgomery No. 24417, 2012-Ohio-3393, ¶ 19 (saying that by agreeing to submit the dynamite charge to the jury, the defendant "waived any error made by the trial court regarding the charge and cannot now complain that he was prejudiced").

**{¶ 25}** The Ohio Supreme Court in *State v. Howard*, 42 Ohio St.3d 18, 537 N.E.2d 188 (1989), rejected the traditional *Allen* charge, given to juries deadlocked on the question of conviction, because of "the potentially coercive impact the language of the *Allen* charge can have on a jury." *Howard* at 22. The Court was concerned about "the effect of language [like that in an *Allen* charge] advising the jury that a decision must be reached, thereby depriving either the state or the defendant of the possibility of a hung jury and a mistrial." *Id.* The Court also thought that "the *Allen* charge is unduly coercive to members of the jury in the minority." *Id.* The goals of this type of charge, said the Court, are to "encourage a verdict where one can conscientiously be reached" and to "be

balanced, asking all jurors to reconsider their opinions in light of the fact that others do not agree." *Id.* at 25. So the Court approved new language, *id.* at paragraph two of the syllabus, which is also found in Ohio Jury Instruction CR 429.09.

{¶ 26} The trial court here refers to the charge that it gave as an *Allen* charge but cites the approved charge. The court's charge is not word-for-word from *Allen* or *Howard*. But "[a] trial court is not required to give a verbatim *Howard* charge, as long as the given charge did not coerce the jurors into reaching a verdict." (Citation omitted.) *Helm* at ¶ 19. Bandedo argues that the charge here is coercive because it encourages a unanimous verdict and calls for all the jurors to reevaluate their positions but does not leave open the possibility of a hung jury and mistrial.

{¶ 27} We disagree. We do not think that the charge unduly coerced the jury to reach a verdict or misled the jury. Although the court's charge is not as concise as the one in CR 429.09, it satisfies *Howard* by encouraging the jury to continue to try and reach a verdict, if it can conscientiously do so; asking the jurors to reconsider their opinions in light of the fact that others do not agree; and not foreclosing the possibility of a hung jury and mistrial:

I send you back with an instruction that you have to re-examine your positions. You have to go say I'm willing to go back and think about whatever it is that I lay my head upon and re-examine that. Whichever side you're on, for guilty or not guilty, everybody needs to go back, take a deep breath, start not necessarily over with all the deliberations but maybe with a different attitude.

I'm not saying change your position. I'm saying go back and re-

examine it. * * *

* * *

* * * I'm not saying change. What I'm saying is we're not to the point where I can declare a mistrial * * *

* * *

If you, in the future, tell me that you cannot agree, then there's yet another step for me to go through.

(Tr. 624-626). As the First District has said, "[i]t is certainly a better practice to give a verbatim *Howard* charge, to ensure that both goals identified in *Howard* are met and that no jurors are coerced into changing their opinion." *Helm* at ¶ 19. But the trial court's charge here substantially complied with *Howard,* and we cannot say that but for the charge the outcome of the proceedings would have been different.

{¶ 28} As a final matter, we reject Bandedo's insufficiency argument based on our earlier review of the sufficiency of the evidence.

{¶ 29} The trial court did not err by overruling Bandedo's motion for a new trial.

{¶ 30} The second assignment of error is overruled.

### III. Conclusion

{¶ 31} We have overruled the two assignments of error presented. The trial court's judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and FROELICH, J., concur.

Copies mailed to:

R. Kelly Ormsby, III
Deborah S. Quigley
P.J. Conboy II
Hon. Jonathan P. Hein