[Cite as *State v. Pursley*, 2025-Ohio-530.]

STATE OF OHIO           )
                              )ss:
COUNTY OF SUMMIT     )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

| | |
|---|---|
| STATE OF OHIO | C.A. No.       30853 |
|      Appellee | |
|      v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ERIC PURSLEY | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
|      Appellant | CASE No.      CR-2022-11-3952 |

DECISION AND JOURNAL ENTRY

Dated: February 19, 2025

CARR, Judge.

**{¶1}** Defendant-Appellant Eric Pursley appeals the decision of the Summit County Court of Common Pleas. This Court affirms.

I.

**{¶2}** On October 5, 2022, Pursley shot and killed his landlord during a dispute. In November 2022, Pursley was charged with two counts of murder and two counts of felonious assault. A firearm specification accompanied each count. The matter proceeded to a jury trial, at which Pursley maintained that he acted in self-defense. During deliberations, after the jury expressed some uncertainty about being able to reach a verdict, the trial court, without objection, read the jury the *Howard* charge. *See State v. Howard*, 42 Ohio St.3d 18 (1989), paragraph two of the syllabus. Thereafter, the jury found Pursley not guilty of one count of murder and guilty of the remaining charges and specifications. The trial court sentenced Pursley accordingly.

{¶3} Pursley has appealed, raising three assignments of error, which will be addressed out of sequence to facilitate our review.

II.

## ASSIGNMENT OF ERROR I

APPELLANT'S CONVICTIONS WERE BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT.

{¶4} Pursley argues in his first assignment of error that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. Specifically, he asserts that the evidence supports that he acted in self-defense.

### Sufficiency

{¶5} With respect to Pursley's sufficiency challenge, we conclude it is misplaced in light of his focus on self-defense. "Self-defense remains an affirmative defense in Ohio, and an affirmative defense is not an element of a crime[.]" *State v. Messenger*, 2022-Ohio-4562, ¶ 24. "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense." *Id.* at ¶ 25. Accordingly, a trial court judge who has instructed a jury on self-defense has determined the defendant put forth sufficient evidence of self-defense. *Id.* at ¶ 26. Meanwhile, a finding of guilt means that, in the eyes of the jury, the State met its burden of persuasion that the defendant was not acting in self-defense. *Id.* "[T]he sufficiency-of-the-evidence standard of review applies to [the defendant's] burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Id.* Given that Pursley's argument is focused on self-defense, a challenge to the sufficiency of the evidence is not appropriate. *See id.* at ¶ 26-27; *see also State v. Susanek*, 2024-Ohio-5298, ¶ 22 (9th Dist.).

**Manifest Weight**

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Id*. "[W]e are mindful that the jury is free to believe all, part, or none of the testimony of each witness. This Court will not overturn a conviction on a manifest weight challenge only because the jury found the testimony of certain witnesses to be credible." (Internal quotations and citations omitted.) *State v. Becton*, 2023-Ohio-4841, ¶ 38 (9th Dist.)

{¶6} Pursley was found guilty of murder in violation of R.C. 2903.02(B), which states, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C. 2903.03] or [R.C. 2903.04]." The indictment specified that the pertinent felony was felonious assault pursuant to R.C. 2903.11. In addition, Pursley was found guilty of two counts of felonious assault, one in violation of R.C. 2903.11(A)(1), and the other in violation of R.C. 2903.11(A)(2). R.C. 2903.11(A) provides that "[n]o person shall knowingly do either of the following: (1) Cause serious physical harm to another or to another's unborn; (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance." A firearm specification also accompanied each count. *See* R.C. 2941.145(A).

{¶7} R.C. 2901.05(B) provides:

(1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

(2) Subject to division (B)(3) of this section, a person is presumed to have acted in self-defense or defense of another when using defensive force that is intended or likely to cause death or great bodily harm to another if the person against whom the defensive force is used is in the process of unlawfully and without privilege to do so entering, or has unlawfully and without privilege to do so entered, the residence or vehicle occupied by the person using the defensive force.

(3) The presumption set forth in division (B)(2) of this section does not apply if either of the following is true:

(a) The person against whom the defensive force is used has a right to be in, or is a lawful resident of, the residence or vehicle.

(b) The person who uses the defensive force uses it while in a residence or vehicle and the person is unlawfully, and without privilege to be, in that residence or vehicle.

(4) The presumption set forth in division (B)(2) of this section is a rebuttable presumption and may be rebutted by a preponderance of the evidence, provided that the prosecution's burden of proof remains proof beyond a reasonable doubt as described in divisions (A) and (B)(1) of this section.

**{¶8}** A self-defense claim requires:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Messenger*, 2022-Ohio-4562, at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "All three of these elements must be present to establish self-defense. To carry its burden of persuasion, the State need only disprove one of the foregoing elements beyond a reasonable doubt." (Internal quotations and citations omitted.) *State v. Falish*, 2024-Ohio-5145, ¶ 22 (9th Dist.).

{¶9}    Here, there is no dispute that Pursley shot and killed his landlord.  The only dispute was whether Pursley acted in self-defense.

{¶10}  The landlord and his wife, who lived in California since 2020, owned eight rental properties in the Akron area.  One of those properties was a house divided into four apartments.  Pursley, who was in his early twenties at the time, began renting an apartment in that house in October 2021.  He resided there with his girlfriend and child.  Pursley's unit was upstairs and the hallway and stairwell to get to the unit were very narrow.

{¶11}  At one point in his tenancy, Pursley was over $3,000 in arrears.  However, on August 2, 2022, Pursley paid off the arrears bringing him to a zero balance.  Nonetheless, by October 5, 2022, the day of the events at issue, Pursley was again two months behind on rent, owing $1,420.

{¶12}  The landlord would visit the rental properties monthly, and the landlord's wife would handle the financial matters related to the properties.  The landlord's goal in visiting the rental properties was to check them all, see if there were any maintenance issues, touch base with the tenants, and collect rent if needed.  Some of the visits were announced and others were not.  The landlord's wife described the landlord as being very flexible with tenants and was prone to giving them more chances to pay.  The landlord's wife indicated that she and the landlord would frequently disagree about how flexible to be.  The landlord and his wife had conversations about tenants that were behind in payments and the landlord made the final decision on whether to proceed with eviction proceedings.  The landlord's wife could not remember any instance of the landlord proceeding differently than they had discussed.  If the landlord was going to issue an eviction notice, he would tape it to the tenant's door, take a photo of the notice, and send it to the landlord's wife.

{¶13} According to the landlord's wife, prior to the October 5, 2022 visit, the landlord and his wife has not discussed evicting Pursley. The landlord had been confident that Pursley would catch up on the rent. The landlord's wife was also not aware of any formal complaints about the condition of Pursley's apartment. She testified that if they had been aware of a mice infestation they would have contacted a pest control company immediately. She noted maintenance requests had to be submitted in writing either by text or email.

{¶14} While the landlord's wife did not go with the landlord to the October 5, 2022 visit to the Akron properties, the landlord's wife testified that she had seen the landlord speak to tenants in the past. She described him as being a "softie." For tenants in arrears, he would talk to them about assistance that might be available from the county and sometimes helped them complete paperwork. The landlord's wife indicated that the landlord could be persistent and would sometimes become frustrated and get a "bit worked up." However, she never saw him act aggressively. The landlord did not carry a firearm and had never owned one. The landlord was 6'1" and weighed 224 pounds. The landlord's wife indicated that he suffered from AFib, which sometimes impacted his energy level and overall strength. He also had a knee injury and a torn rotator cuff. The rotator cuff injury prevented him from doing any upper body lifting when he worked out.

{¶15} None of the witnesses whom police spoke to witnessed the shooting, although some did report hearing arguing and/or a gunshot. It was also noted that some of the tenants had complaints about the property. Pursley's girlfriend, who was in the apartment at the time of the shooting also did not see it but did hear arguing and the gunshot.

{¶16} The medical examiner testified that the landlord's cause of death was a gunshot wound to the head and the manner of death was homicide. The medical examiner was unable to

determine whether the gunshot was a contact, close, or intermediate range wound because it was a wound involving the scalp and the hair can filter out gunpowder particles making distance more difficult to ascertain. The wound was located on the right side of the landlord's head above the ear. The medical examiner described the wound as an injury that would have resulted in incapacity rapidly if not instantly, due to the path of the bullet. The medical examiner indicated that it would have been highly unlikely that the landlord could have taken a step or two after being shot. The medical examiner was unable to determine the orientation of the landlord or the position of his body at the time of the shooting. If it was presumed the landlord was standing at the time of the shooting, the path of the bullet was from the right side to the back of the head and downward. No alcohol or drugs were found in the landlord's system.

{¶17} Detective Aron Hanlon with the Akron Police Department testified that, while the department considered self-defense when evaluating the matter, ultimately, the department was unconvinced it was self-defense. Detective Hanlon indicated that that conclusion was reached after considering the evidence, including the fact that the landlord was found shot outside the apartment door with a completed eviction notice, duct tape, and cellphone in the vicinity of his person. Detective Hanlon believed that Pursley became upset about being evicted.

{¶18} Pursley testified in his own defense. On the day of the shooting, the landlord came to Pursley's apartment unannounced. At the time, Pursley, his girlfriend, and their child were in the apartment. Pursley testified that he is 5'4" and 150 pounds. The landlord stood outside the doorway, approximately an arms-length away. A conversation took place about Pursley's nonpayment of rent. He testified that the landlord did not show the eviction notice to Pursley and the first time he saw it was at trial. Pursley asserted that the landlord also did not discuss evicting Pursley. Pursley averred that he told the landlord multiple times that the apartment had a mice

problem. The landlord indicated that the mice did not take the bait, and he did not know what else to do about it. Pursley also explained to the jury that he did not have air conditioning in the unit because he did not realize having a unit required an extra fee. Additionally, he did not have access to the thermostat and so the apartment got extremely hot. Pursley also complained of multiple break-ins in the building and that a downstairs tenant found fentanyl. Because of the break-ins, Pursley purchased a handgun and underwent training in how to use it. He kept it in a safe in the bedroom, although sometimes he kept it on his person in a holster.

{¶19}  Pursley informed the landlord that if he was not going to do anything about the problems, Pursley was going to move out. Pursley also stated that he was not going to pay rent until the landlord fixed the problems. According to Pursley, the landlord then became angry. Pursley described the landlord as being belligerent and loud. At that point, Pursley had his girlfriend retrieve the gun. The landlord did not threaten Pursley with a weapon or produce one. After Pursley had the weapon, he warned the landlord three times to back up, because the landlord kept getting closer to Pursley. Pursley then loaded the weapon. Pursley again asked the landlord to back up and told the landlord that he "really [did not] want to do this." The landlord then said, "I can do what I want. This is your day of reckoning, and you have to do what I said." Pursley was confused by the landlord's behavior because he had never seen him act like that before. Pursley was frightened as the landlord was right at the entrance of the apartment and there was nowhere for Pursley to go to escape. Pursley told the landlord to back up two additional times after loading the weapon. The landlord then pulled out his cellphone and pretended to make a phone call. The landlord dropped the phone and reached for Pursley's throat. Pursley shuffled backward and fired a single shot at the landlord. Pursley claimed to be aiming for the landlord's shoulder, but the landlord had dropped his head while reaching and lunging for Pursley. Pursley

said it seemed like the landlord was trying to tackle Pursley. The landlord never made contact with Pursley or even touched him. Pursley testified that he believed his, his girlfriend's, and his child's lives were in danger and that was why he shot the landlord. Pursley believed he had no other option than to fire the weapon. Pursley testified that, at the time he fired the shot, he had one foot in the bathroom behind him and had nowhere to go as the landlord had stepped into the apartment. Pursley claimed that after being shot, the landlord then stumbled back a couple steps and fell to the ground outside of the apartment. Pursley then put the firearm down, retrieved his phone, and called 911.

{¶20} The 911 call was played for the jury and admitted into evidence. In the call, Pursley sounds remarkably calm and unemotional. He states that he was in a self-defense shooting and the landlord tried to enter the vicinity and was getting very aggressive and tried to attack Pursley. Pursley indicates that the landlord started to reach towards Pursley's throat and Pursley was concerned the landlord would go after his girlfriend and child next. Pursley explains that he shot the landlord, and he was dead. Pursley states that he was standing his ground. He informs the dispatcher that the gun is on the ground. He describes what he is wearing in some detail and indicates that he would have his hands up.

{¶21} When police arrived, Pursley was cooperative and compliant with law enforcement. Pursley did not have any injuries or request medical attention.

{¶22} After conducting an independent review of the record, we cannot say Pursley has demonstrated that the jury lost its way in finding Pursley guilty of the charges. The jury had before it facts that were likely somewhat difficult to reconcile. The landlord was described as being a "softie" who always discussed evictions with his wife and who, according to the landlord's wife, had not planned to evict Pursley. Yet, a completed eviction notice was found by the landlord's

body, along with duct tape, and a cellphone. Further, Pursley described the landlord as belligerent and angry. Pursley also described the landlord as entering the apartment at the time he was shot and then stumbling backwards even though the medical examiner testified that it would be extremely unlikely the landlord could have taken a step or two after being shot. Notably, the landlord's body was found outside the apartment. The landlord had no weapon on him, nor did he threaten Pursley with a weapon. Neither Pursley nor the landlord had any defensive injuries. While there certainly was a substantial size difference between Pursley and the landlord, with the landlord being substantially taller and heavier than Pursley, we cannot say that the jury was unreasonable in concluding that Pursley was guilty. Even though there was no person to directly contradict Pursley's version of events, the jury could still have not believed Pursley's version in light of the other evidence presented. *See Becton*, 2023-Ohio-4841, at ¶ 38 The jury could have disbelieved that the landlord lunged at Pursley while he had a loaded weapon pointed at the landlord, or the jury could have found it unconvincing that the landlord was belligerent and angry, or the jury could have found it not credible that Pursley feared for his life when he sounded calm and unemotional on the 911 call. In sum, Pursley has not demonstrated that the jury was unreasonable in concluding that the State met its burden of persuasion and established that Pursley did not act in self-defense.

{¶23} Pursley's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED WHEN IT READ THE SUPPLEMENTAL HOWARD INSTRUCTION WITHOUT BEING NOTIFIED THAT THE JURY WAS DEADLOCKED.

{¶24} Pursley asserts in his third assignment of error that the trial court committed plain error in giving the *Howard* instruction to the jury.

**{¶25}** "A *Howard* charge is a supplemental instruction that is given to a deadlocked jury unable to reach a verdict." *State v. McCormick*, 2020-Ohio-3140, ¶ 15 (9th Dist.), quoting *State v. Helm*, 2016-Ohio-500, ¶ 15 (1st Dist.). However, "[t]here is no requirement that a jury specifically indicate that it is deadlocked before it is appropriate for a trial court to give a *Howard* charge." *McCormick* at ¶ 16. "Instead, it is within a trial court's discretion to determine whether a jury is deadlocked." *Id.*

**{¶26}** The *Howard* charge states:

The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

*Howard*, 42 Ohio St.3d at 25-26. In promulgating the *Howard* charge, the Supreme Court sought to "encourage a verdict where one can conscientiously be reached . . . [and provide a balanced instruction], asking all jurors to reconsider their opinions in light of the fact that others do not agree." *Id.* at 25. The *Howard* instruction replaced the *Allen* charge, which was being abandoned at the time due to its "coercive potential." *Id.*

{¶27} Pursley does not challenge the wording used by the trial court in the *Howard* charge and instead appears to assert that it was given prematurely.

{¶28} The jury began deliberating at 10:45 am on July 20, 2023. The day prior, the jury heard all of the testimony. At approximately 1:45 pm on July 20, 2023, the jury presented a question to the trial court with respect to the definition of initial aggressor, which the trial court responded to after consulting with both sides. The jury continued deliberating. At some point later that same day, the trial court had a discussion with the parties. The trial court informed the parties that the jury foreman indicated to the bailiff that the jury wanted a break, and the jury might be at a stalemate. The bailiff encouraged the jury to take a break. When they resumed, the foreman stated that he did not think they were going to reach a verdict and one of the jurors asked to go around the table again. The bailiff left and the jury deliberated for another half hour. The foreman then told the bailiff that he thought they needed to get some resolution, but it would not happen that day and the jury would like to come back the next day.

{¶29} The trial court told the parties that it thought it was appropriate to recess the jury until the next day given the jury's request. In addition, the trial court opined that, given that the jury was deliberating for longer than the case was tried, it was important to give the jury the *Howard* charge. The trial court wanted to know whether the parties supported this approach and noted that the charge probably could have been given sooner.

{¶30} The State did not object to the charge. Defense counsel questioned whether it was appropriate as the jury did not say it was deadlocked. The trial court noted the instruction does not mention being deadlocked and indicated that stalemate could be synonymous with deadlock. The trial court reiterated that the jury had been deliberating for a time equivalent to, or longer than, the case was tried and did not believe the jury had to use the word deadlock. The trial court

expressed concern that there could be a mistrial and encouraged the parties to discuss whether a resolution could be reached. At the end of the discussion, neither the State nor defense counsel objected to the reading of the *Howard* charge. Accordingly, the issue is subject to plain error review. *See McCormick*, 2020-Ohio-3140, at ¶ 13.

{¶31} The trial court then brought the jury in and read the charge and sent the jury home for the evening. The jury returned the next day at 8:30 am to deliberate and reached a verdict at 12:30 pm. The jury found Pursley not guilty of the first count of murder and guilty of the remaining charges.

{¶32} Pursley has not demonstrated that the trial court abused its discretion, let alone committed plain error. Pursley has stated in his briefing to this Court that, after receiving the *Howard* charge, the jury quickly returned a verdict. However, this is not the case based upon the record before us. The record reflects that the jury was to reconvene at 8:30 am and a verdict was reached at 12:30 pm that day. Thus, Pursley's apparent contention that reading the instruction coerced the jury into reaching a verdict is not supported. Additionally, we observe that this Court has previously found it appropriate for a trial court to give a *Howard* instruction an hour and twenty-five minutes into deliberations when the jury indicated that seven of the jurors had reached a verdict and one person would not budge. *See State v. Pinckney*, 2017-Ohio-2836, ¶ 12, 15 (noting that "[i]n its initial communication to the court, Mr. Pinckney's jury did not indicate that reaching a verdict would be impossible. It merely advised the court of the situation in which it found itself. It had been deliberating for less than 90 minutes. The court responded appropriately with the *Howard* charge, the purpose of which is to encourage the jury to reach a verdict, if it can do so conscientiously").

**{¶33}** While Pursley also appears to assert that giving the *Howard* charge causes a jury to switch to favoring a guilty verdict, the sources he references are about the *Allen* charge, not the *Howard* charge that was given. As mentioned above, the *Allen* charge was abandoned because of its coercive potential. *See Howard*, 42 Ohio St.3d at 25.

**{¶34}** Pursley has also not convinced this Court that the result would have been different had the trial court waited to give the *Howard* charge. The jury did not quickly return a verdict after the *Howard* charge was given, and instead deliberated for four more hours. The jury also found Pursley not guilty of one of the murder counts. Further, Pursley has not pointed to any cases with similar circumstances in which a claim of plain error was sustained, nor has this Court located any authority that would support the trial court abused its discretion or committed plain error.

**{¶35}** Pursley's third assignment of error is overruled.

## ASSIGNMENT OF ERROR II

APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL.

**{¶36}** Pursley argues in his second assignment of error that his trial counsel was ineffective. Pursley points to several different issues which will each be addressed in turn.

**{¶37}** In order to prevail on a claim of ineffective assistance of counsel, Pursley must show that "counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance." *State v. Reynolds*, 80 Ohio St.3d 670, 674 (1998), citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland* at 686. Thus, a two-prong test is necessary to examine such claims. First, Pursley must show that counsel's performance was objectively deficient by producing evidence that counsel acted

unreasonably. *State v. Keith*, 79 Ohio St.3d 514, 534 (1997), citing *Strickland* at 687. Second, Pursley must demonstrate that but for counsel's errors, there is a reasonable probability that the results of the trial would have been different. *Keith* at 534. "This Court need not address both prongs of the *Strickland* test if the appellant fails to satisfy either prong." *State v. Gannon*, 2020-Ohio-3075, ¶ 23 (9th Dist.), citing *State v. Ray*, 2005-Ohio-4941, ¶ 10 (9th Dist.).

### Failure to Present Additional Evidence in Pursley's Defense

{¶38} First, Pursley suggests that trial counsel was ineffective in failing to call any witnesses aside from Pursley, failing to present any exhibits, and failing to offer any evidence to corroborate Pursley's testimony.

{¶39} "In a direct appeal, ineffective assistance of counsel must be demonstrated by evidence within the record." *State v. Anderson*, 2023-Ohio-4463, ¶ 29 (9th Dist.). "[S]peculation is insufficient to establish ineffective assistance." *State v. Jackson*, 2023-Ohio-4467, ¶ 34 (9th Dist.), quoting *State v. Perez*, 2009-Ohio-6179, ¶ 217. We are not persuaded by Pursley's argument which relies heavily on speculation. We note that Pursley himself testified that there were no other witnesses to the shooting and that no one else saw what happened. The notion that other witnesses or evidence would have supported Pursley's defense is pure speculation given the record before us.

### Failure to Object During Voir Dire

{¶40} Pursley next argues that trial counsel was ineffective for failing to object during voir dire. During voir dire, the State asked the potential jurors if Pursley's exercising his right to a trial said anything about his guilt or innocence. While trial counsel did not object, the trial court called the attorneys for a side bar. The trial court informed the State that the trial court did not find the line of questioning appropriate as Pursley was presumed to be innocent. The trial court

requested that the State clarify that so that the jury would understand that Pursley was presumed innocent. The State then did so. Thus, even if we were to assume that defense counsel should have objected prior to the trial court raising the issue, Pursley has not demonstrated that he was prejudiced. While the State's initial statements may not have been ideal, the State did go on to clarify its statements and ensured that the jury understood that Pursley was presumed innocent at that point.

### Failure to Object to Autopsy Photos

**{¶41}** Pursley also asserts that trial counsel was ineffective in failing to object to the display of the landlord's autopsy photos. Four photographs of the landlord were presented by the medical examiner, two of his face, and two of the injury. In addition, photos of x-rays depicting the path of the bullet were shown. This Court has stated that "[a]utopsy photographs are generally admissible to help the jury appreciate the nature of the crimes, to illustrate the coroner's or other witnesses' testimony by portraying the wounds, to help prove the defendant's intent, and to show the lack of accident or mistake." (Internal quotations and citations omitted.) *State v. Buck*, 2017-Ohio-273, ¶ 80 (9th Dist.). Pursley has not demonstrated that any objection by trial counsel would have been sustained and, thus, he has not established that trial counsel's performance fell below an objective standard of reasonableness.

### Failure to Object to the State's Closing Argument

**{¶42}** Pursley next maintains that trial counsel was ineffective in failing to object during the State's closing argument when the State told the jury that Pursley "took the life of [the landlord] for, as the evidence shows, no good reason. He took [the landlord] from a family who loved him forever." However, even assuming the State should not have made that statement during closing

arguments, Pursley has not explained how, or demonstrated that, the statement prejudiced him and altered the result of the trial. Accordingly, Pursley's assertion is without merit.

## Failure to Object to the *Howard* Charge

**{¶43}** Pursley next argues that trial counsel was ineffective in failing to object to the *Howard* charge. As we discussed above, Pursley did not demonstrate that the trial court abused its discretion in giving the *Howard* charge. Thus, it is difficult to conclude that trial counsel was ineffective in failing to object to it. Moreover, the record is clear that counsel considered whether to object and opted not to. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." (Internal quotations and citations omitted.) *State v. Foster*, 2024-Ohio-4657, ¶ 21 (9th Dist.). Further, Pursley has not convinced this Court that he was prejudiced by the trial court giving the charge; therefore, we fail to see how trial counsel's failure to object to it could have been prejudicial.

**{¶44}** Pursley has not demonstrated that trial counsel was ineffective. Pursley's second assignment of error is overruled.

### III.

**{¶45}** Pursley's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

STEVENSON, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

NOAH MUNYER, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.