[Cite as *State v. Helm*, 2016-Ohio-500.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-150242 |
| | | TRIAL NO. B-1403724 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| TONY HELM, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  February 12, 2016

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Schuh & Goldberg, LLP*, and *Brian T. Goldberg*, for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**Sylvia S. Hendon, Judge.**

{¶1}    Following a jury trial, defendant-appellant Tony Helm was found guilty of burglary and menacing by stalking and was sentenced to nine-and-a-half-years' imprisonment.

{¶2}    Helm has appealed, arguing in four assignments of error that the trial court erred by giving the jury an inaccurate version of the *Howard* charge; that the trial court failed to properly admonish the jury; that the trial court erred by failing to declare a mistrial when the jury conducted deliberations without all members present; and that his convictions were not supported by the sufficiency or the weight of the evidence.  Finding no merit in Helm's arguments, we affirm the trial court's judgment.

*Factual Background and Procedure*

{¶3}    The victim of Helm's menacing offense was Megan Barnes.  Helm and Barnes began dating in April of 2012.  In September of 2012, Helm and Barnes jointly signed a lease for an apartment in Norwood, where they resided with Barnes' two sons from a previous marriage.  But Barnes and Helm separated one year later, and Barnes and her sons moved into a home in Lockland.  Barnes leased the Lockland home in her name only.  From September of 2013 until June of 2014, Barnes and Helm's relationship was off and on.  Helm drove trucks for a living and was on the road for large periods of time.  When he and Barnes were on-again, he would live at Barnes' Lockland home when not on the road for work.

{¶4}    On June 1, 2014, Lockland police officer Matthew Kurtz was dispatched to Barnes' residence for a harassment call.  When he arrived, Barnes was

visibly frightened and crying, and reported that she had been having a conflict with her ex-boyfriend, Helm. Barnes showed Officer Kurtz text messages on her phone that she had received from Helm, in which he had threatened to harm her and stated that he was hiding in the woods. Officer Kurtz spoke with Helm on the phone and informed Helm that charges would be filed against him if he persisted in his conduct.

{¶5} On June 2, 2014, pictures of Barnes in a state of undress were posted on the Facebook page of her employer, Thoma & Sutton Eye Care. Emily Martin, a manager in Thoma & Sutton's corporate office, testified that she deleted the photographs immediately, and that they had been posted by a person named Tony Helm. That same day, Lockland police officer Brandon Ruth responded to a call at Barnes' residence. Barnes reported that Helm had posted inappropriate photographs of her on her company's website. Barnes followed the advice of Officer Ruth and obtained a temporary protection order against Helm. While delivering a copy of the order to the Lockland police station, Barnes reported that Helm had assaulted her several weeks prior. But because Barnes had no visible injuries, Officer Ruth declined to file charges regarding the assault at that time.

{¶6} Approximately one to two weeks after obtaining the restraining order, Barnes encountered Helm while fishing at Folz Lake. The two talked, and Helm agreed to delete all inappropriate photographs of Barnes from his phone. At that time, the two decided to try and reconcile. Once the protection order that Barnes had obtained expired, on or around June 16, 2014, Helm moved back in with Barnes.

{¶7} On the morning of June 25, 2014, Barnes confronted Helm about a swinger's website that he had accessed on his telephone. They argued, and after Barnes left for work, she received numerous graphic text messages from Helm,

3

including a message informing her that he had taken all of his belongings and had moved out of her home. After removing his belongings from Barnes' home, Helm filed a criminal damaging report with the Lockland police, alleging that Barnes had damaged his motorcycle while it had been stored at her home.

{¶8} Barnes went home in the middle of the afternoon and verified that all of Helm's belongings were gone. She secured her home by locking all doors and windows, and, because Helm still had a key to her front door, Barnes placed a kick bar in that door to prevent him from entering. She returned to work and continued to receive threatening and graphic text messages from Helm all afternoon. One text read "just because my bike in my truck is not there does not mean I'm not." Another read "going silent now about to get dark see if you make it in the morning to Starbucks good luck."

{¶9} Barnes went to the Lockland police station on her way home from work to report the text messages. Although Barnes was visibly upset, she was told that all officers were busy and was asked to come back during normal business hours the next day to have the messages downloaded from her telephone. Barnes returned home at approximately 7:00 that evening and immediately noticed that her back door was open and that it had a broken lock. Barnes called the police and did not enter her home. Lockland police sergeant Patrick Sublet responded to Barnes' home. He saw that the deadbolt was missing from the back door, that the door jamb was damaged, and that the door had been forcibly opened. During his search of the house, Sergeant Sublet saw that a pillow on Barnes' bed had been slashed, and he found a knife sticking out of her mattress. He further found a marijuana-growing operation in Barnes' basement and drug paraphernalia in her bedroom.

{¶10} Helm continued to send threatening text messages to Barnes throughout the evening and into the next day. Sergeant Sublet was again dispatched to Barnes' home at approximately 3:30 a.m. on June 26, 2014. Barnes reported that the tires to her car had been slashed, and that she had received a text message from Helm stating "How did you like your pillow? Your [sic] next." Barnes received numerous text and voice messages from Helm over the following days. These messages suggested that she should kill herself and included a threat from Helm to kill her. Helm was arrested outside Barnes' home on June 30, 2014, on an open warrant for burglary. While being transported to the police station, Helm stated that if he caught Barnes with another man he would kill them both. Helm was charged with burglary, menacing by stalking, and domestic violence.

{¶11} At trial, Barnes testified regarding her and Helm's rocky relationship. She testified that Helm had struck her twice in the face sometime near the end of May of 2014, causing a bloody nose and a black eye. She further read for the jury all the threatening text messages that she had received from Helm during May and June of 2014. She testified that she feared for her safety and that her mental stability was held together by a string.

{¶12} Helm testified at trial. He denied striking Barnes in the face in May of 2014, but admitted to sending the threatening text messages. Helm additionally denied stabbing a knife in Barnes' mattress. He testified that the text message he had sent about Barnes' pillow was meant to reference the fact that he had smeared dog feces on her pillow before leaving her home. But Sergeant Sublet had testified that no dog feces had been found on Barnes' bedding.

{¶13}  The jury convicted Helm of burglary and menacing by stalking, but it acquitted him of domestic violence.  The trial court sentenced Helm to an aggregate term of nine-and-a-half-years' imprisonment.

### Howard Charge

{¶14}  In his first assignment of error, Helm argues that the trial court erred by giving the jury a version of the *Howard* charge that did not comport with the language approved by the Ohio Supreme Court.

{¶15}  A *Howard* charge is a supplemental instruction that is given to a deadlocked jury unable to reach a verdict.  In *State v. Howard*, the Ohio Supreme Court recognized two specific goals that such a supplemental instruction should further, namely to "encourage a verdict where one can conscientiously be reached," and to be balanced, "asking all jurors to reconsider their opinions in light of the fact that others do not agree."  *State v. Howard*, 42 Ohio St.3d 18, 25, 537 N.E.2d 188 (1989).  The *Howard* court wanted to ensure that a supplemental instruction of this nature would not be coercive and pressure members of the jury in the minority to change their opinion.  *Id.* at 22.

{¶16}  In *Howard*, the court specifically approved the following supplemental instruction to be given to a deadlocked jury:

> The principal mode, provided by our Constitution and laws, for deciding questions of fact in criminal cases, is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusion of your fellows, each question submitted to you should be examined with

proper regard and deference to the opinions of others. You should consider it desirable that the case be decided. You are selected in the same manner, and from the same source, as any future jury would be. There is no reason to believe the case will ever be submitted to a jury more capable, impartial, or intelligent than this one. Likewise, there is no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case, if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced it is erroneous. If there is disagreement, all jurors should reexamine their positions, given that a unanimous verdict has not been reached. Jurors for acquittal should consider whether their doubt is reasonable, considering that it is not shared by others, equally honest, who have heard the same evidence, with the same desire to arrive at the truth, and under the same oath. Likewise, jurors for conviction should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.

*Id.* at 25.

{¶17} In this case, after deliberating for approximately two days, the jury sent a note to the trial court stating that it was at an impasse and had only been able to reach a verdict on two of three offenses with which it had been charged. The trial court then read the following charge to the jury:

It is conceivable that after a reasonable length of time honest differences of opinion on the evidence may prevent an agreement upon a verdict. When that condition exists, you may consider whether further deliberations will serve a useful purpose. If you decide that you cannot agree and that further deliberations will not serve a useful purpose, you may ask to be returned to the courtroom and report that back to the Court. If there is a possibility of reaching a verdict, you should continue your deliberations. It would be the preference of this court that you try to come to an agreement on the third charge, simply because no other jury is going to—everybody is going to be picked the exact same way that you were. The evidence is not going to change from now until—with a different jury. And it will be my preference if you would at least try to come to an agreement if at all possible. I would ask that you go back at this time. Why don't we try for maybe a half an hour and see if you all are able to come to an agreement. If you are not, please ring us and I will bring you back out here and make the determination at that time on the third charge.

{¶18} Helm raised no objection to this charge. The jury resumed deliberating, and later returned a verdict on all three charges. Helm now argues that the trial court's instruction failed to comply with the language approved in *Howard*, and that the 30-minute-time restraint imposed by the trial court pressured the jury to reach a verdict. Because Helm failed to object to this charge, he has forfeited any claim of error with respect to it, unless the outcome of the proceedings would have

been different but for the charge. *See State v. McClellan*, 93 Ohio App.3d 315, 326, 638 N.E.2d 593 (1st Dist.1994).

{¶19} A trial court is not required to give a verbatim *Howard* charge, as long as the given charge did not coerce the jurors into reaching a verdict. *See State v. Carson*, 1st Dist. Hamilton No. C-040042, 2005-Ohio-902, ¶ 58, *rev'd on other grounds*, *In re Ohio Criminal Sentencing Statutes Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174 (2006). We have previously overruled challenges to a *Howard* charge given by a trial court that differed to some degree from the exact language approved by the *Howard* court. *See State v. Dickens*, 1st Dist. Hamilton No. C-960365, 1998 Ohio App. LEXIS 2098 (May 8, 1998). In this case, the charge given by the trial court admittedly differed from the Ohio Supreme Court's approved language to a much greater extent than other charges that we have approved. It entirely omitted any language asking the jurors to reconsider their opinions in light of the fact that others did not agree, one of the two goals recognized in *Howard*. But the trial court's charge did encourage jurors to reach a verdict if they could conscientiously do so, and it was in no manner coercive. It is certainly a better practice to give a verbatim *Howard* charge, to ensure that both goals identified in *Howard* are met and that no jurors are coerced into changing their opinion. But the trial court's charge substantially complied with *Howard*, and we cannot find that the outcome of the proceedings would have been different but for the charge.

{¶20} We likewise find no error in the trial court's instruction that the jury resume deliberations for the set time of 30 minutes. The trial court did not pressure the jury to reach a verdict within that time frame, nor did it indicate that it would

declare a mistrial at the end of that time frame if a verdict was not reached. *See State v. Johns*, 60 Ohio App.3d 88, 92, 573 N.E.2d 766 (1st Dist.1989).

{¶21} Helm's first assignment of error is overruled.

### *Jury Issues*

{¶22} In his second assignment of error, Helm argues that the trial court erred by not properly admonishing the jury during trial.

{¶23} R.C. 2945.34 provides that when the jury is permitted to separate during trial, the trial court shall admonish the jurors "not to converse with, nor permit themselves to be addressed by any person, nor to listen to any conversation on the subject of the trial, nor form or express any opinion thereon, until the case is finally submitted to them."

{¶24} Helm contends that the trial court failed to comply with R.C. 2945.34 because it did not instruct the jurors not to form or express an opinion on the case until it was submitted to them. He is correct. The record indicates that, while the trial court did admonish the jurors not to discuss the case when separated, it failed to instruct them not to form an opinion on the matter prior to submission. Helm failed to object to any of the trial court's admonishments, or lack thereof, during trial. Consequently, we review only for plain error. *See State v. Stout*, 12th Dist. Warren No. CA2010-04-039, 2010-Ohio-4799, ¶ 56. Plain error is that which affects the defendant's substantial rights. *See* Crim.R. 52(B).

{¶25} R.C. 2945.34 does not prescribe reversal for a trial court's noncompliance. *See Stout* at ¶ 57; *State v. Rose*, 2d Dist. Montgomery No. 17431, 1999 Ohio App. LEXIS 3824, *5 (Aug. 20, 1999). The trial court should have fully complied with R.C. 2945.34 and given the complete admonishment provided by

statute. But the record contains no evidence that any juror engaged in misconduct or actually formed an opinion on the matter prior to the case being submitted. *See State v. Beyer*, 1st Dist. Hamilton No. C-76509, 1977 Ohio App. LEXIS 9332, *5 (Nov. 23, 1977). We find that no plain error resulted from the trial court's failure to comply with R.C. 2945.34. The second assignment of error is overruled.

{¶26} In his third assignment of error, Helm argues that the trial court erred by failing to declare a mistrial when the jury conducted deliberations without all members present. He alleges that the trial court's actions were in violation of R.C. 2945.33, which provides that "[w]hen a cause is finally submitted the jurors must be kept together in a convenient place under the charge of an officer until they agree upon a verdict, or are discharged by the court."

{¶27} The record indicates that, during the deliberation phase of the trial, the trial court indicated on the record that it intended to release the jurors for lunch. At that point, one juror left the courtroom to feed a parking meter, apparently unbeknownst to the trial court. While that juror was gone, the trial court and counsel entered the jury room to provide off-the-record admonitions to the jury. The juror then returned from feeding the meter, and the trial court admonished all members of the jury on the record.

{¶28} This episode was highly irregular. The juror should not have left the courtroom to feed the meter at that time, and the trial court should not have admonished the jury without all members present. But Helm never raised any objection to this procedure or requested that the trial court declare a mistrial. While the trial court did err in allowing the jury to separate in violation of R.C. 2945.33, we find that it did not amount to plain error because neither Helm's substantial rights

nor the outcome of the trial were affected. *See State v. Hunter*, 1st Dist. Hamilton Nos. C-140684, C-140704 and C-140717, 2016-Ohio-123, ¶ 25. The record is clear that both the trial court and counsel were present with the jury the entire time the single juror had left to feed the meter. It contains no evidence that the jury engaged in deliberations without all members present, or that the juror who had left the courtroom engaged in any misconduct. The third assignment of error is overruled.

### *Sufficiency and Weight*

{¶29} In his fourth assignment of error, Helm challenges the sufficiency and weight of the evidence supporting his convictions.

{¶30} We do not weigh the evidence when considering its sufficiency. Rather, we must view all evidence and reasonable inferences in the light most favorable to the prosecution, and determine whether the trier of fact could have found all the elements of the offenses proven beyond a reasonable doubt. *See State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). When reviewing the manifest weight of the evidence, we must consider the credibility of the witnesses and weigh the evidence presented to determine whether, in convicting Helm, the jury lost its way and created such a manifest miscarriage of justice that Helm's convictions must be overturned. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶31} Helm was found guilty of burglary under R.C. 2911.12(A)(2), which provides that

> No person, by force, stealth, or deception, shall * * * trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary

habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense.

Helm contends that he could not have been found guilty of burglary because he had been living with Barnes and had not trespassed into her residence. A trespass is committed when a person knowingly enters the land or premises of another without privilege to do so. *See* R.C. 2911.21(A)(1). When determining whether a trespass has occurred, the custody and control of the dwelling, rather than legal title, are dispositive. *See State v. Lilly*, 87 Ohio St.3d 97, 102, 717 N.E.2d 322 (1999).

{¶32} Helm had no legal title to Barnes' residence, nor did he have custody or control over the dwelling. The home was rented in Barnes' name only, and Helm stayed with her when the two were in a relationship and his job did not require him to be out of town. The burglary occurred sometime in the late afternoon or early evening of June 25, 2014. Earlier that same day, Helm, of his own volition, moved all of his belongings out of Barnes' residence and informed her via text message that he had done so. Barnes verified that he had left her premises, and she placed a kick bar in her front door to prevent Helm from using a key to enter. Barnes clearly had sole custody and control of the dwelling, and the record contains sufficient evidence to demonstrate that Helm had trespassed onto her property.

{¶33} Helm further argues that the state introduced no evidence to establish that he had perpetrated the offense. We disagree. The police had found a knife sticking out of Barnes' mattress and her pillow slashed. And the state had introduced into evidence numerous text messages that Helm had sent to Barnes, including one

stating "How did you like your pillow? Your [sic] next." This was sufficient circumstantial evidence to establish Helm's identity as the perpetrator of the offense.

{¶34} With respect to his conviction for menacing by stalking, Helm alleges that the evidence was not sufficient to establish that Barnes had suffered mental distress. Helm was convicted of menacing by stalking under R.C. 2903.211(A)(1), which provides that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

{¶35} The evidence presented established that Barnes was terrified of Helm and believed that he would cause her physical harm. She reported his behavior to the police on numerous occasions and obtained a temporary protection order against him. She specifically testified that she feared for her safety and that her mental stability was held together by a string. Helm's conviction for menacing by stalking was supported by sufficient evidence.

{¶36} We further conclude that Helm's convictions for burglary and menacing by stalking were supported by the weight of the evidence. The jury was in the best position to judge the credibility of the witnesses, and it was entitled to find credible the testimony offered by Barnes and reject that offered by Helm.

{¶37} The fourth assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

FISCHER, P.J., and CUNNINGHAM, J., concur.

Please note:
   The court has recorded its own entry on the date of the release of this opinion.