# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-240406 |
|  |  | TRIAL NO. | B-2204946-A |
| Plaintiff-Appellee, | : |  |  |
| vs. | : |  |  |
| JAMAL JEWELL, | : | *JUDGMENT ENTRY* |  |
| Defendant-Appellant. | : |  |  |

This cause was heard upon the appeal, the record, the briefs, and the State's argument.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 7/16/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Jewell*, 2025-Ohio-2496.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-240406 |
| | | TRIAL NO. | B-2204946-A |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| | | *OPINION* | |
| JAMAL JEWELL, | : | | |
| Defendant-Appellant. | : | | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 16, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Angela J. Glaser*, for Defendant-Appellant.

**KINSLEY, Presiding Judge.**

**{¶1}** Defendant-appellant Jamal Jewell was found guilty by a Hamilton County jury of murder, kidnapping, felonious assault, tampering with evidence, possessing a firearm while under a disability, and related firearm specifications. He was sentenced to an aggregate term in prison of 32 years to life. Jewell now appeals, arguing that detectives violated his right against self-incrimination, that his trial attorney provided ineffective assistance of counsel, that the trial court incorrectly instructed the jury, and that the evidence pointed to Jewell's two codefendants as the shooters. As we explain in this opinion, we reject Jewell's arguments and affirm the judgment of the trial court.

### Factual and Procedural History

**{¶2}** R.H. was fatally shot on Gray Road on November 21, 2018. Police initially suspected an individual found at the scene the night of the shooting, but ultimately exonerated her. No other early leads developed, and the case went cold.

**{¶3}** Then, in September of 2022, Cincinnati Police detectives received word from Ross Correctional Institution ("Ross") that Jewell wanted to talk with them. Jewell was incarcerated at Ross at the time for an unrelated crime. On September 15, 2022, Detective Marcus McNeil from the Cincinnati Police Department ("CPD") traveled to Ross to meet with Jewell. At their meeting, Jewell told McNeil that he was present when R.H. was shot and that two siblings, Alexis and Michael Hill, were the culprits.

**{¶4}** McNeil subsequently investigated the involvement of both the Hill siblings and Jewell in R.H.'s murder. He spoke with the Hills and he reinterviewed Jewell at Ross. He also collected additional physical evidence, including a surveillance video showing Jewell and R.H. outside a nightclub together the night of the shooting

and a Maaco receipt indicating a car had been painted to change its color just days after R.H. died.

{¶5} On June 8, 2023, Michael Hill, Alexis Hill, and Jewell were all three indicted for R.H.'s death. The charges against Jewell included: (1) Counts 1 and 2, murder in violation of R.C. 2903.02(A) and (B), both felonies of the first degree; (2) Count 3, kidnaping in violation of R.C. 2905.01(A)(3), a felony of the first degree; (3) Counts 4 and 5, felonious assault in violation of R.C. 2903.11(A)(1) and (A)(2), both felonies of the second degree; (4) Count 6, tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the second degree; and (5) Counts 7 and 8, having a weapon under disability in violation of R.C. 2923.12(A)(2), a felony of the second degree. Jewell also faced accompanying firearm specifications.

### A. Motion to Suppress

{¶6} Following his indictment, Jewell filed a motion to suppress the statements he made to McNeil. He argued that he was subjected to a custodial interrogation during his first interview with McNeil and therefore should have received *Miranda* warnings, but did not. With respect to his second interview, he contended that his signature on a *Miranda* rights notification form did not constitute an effective waiver of his self-incrimination rights.

{¶7} The trial court heard Jewell's suppression motion on May 13, 2024.

{¶8} McNeil testified on behalf of the State at the hearing. He explained that he began investigating R.H.'s death on November 21, 2018, the night of the shooting. The investigation went cold when the initial suspect was cleared.

{¶9} On September 14, 2022, McNeil received word from Ross that Jewell wanted to speak with a CPD detective about a homicide. The next day he and Detective Todd Green went together to Ross to meet with Jewell. The meeting took place in an

4

investigator's office at the prison. McNeil did not consider Jewell a suspect at the time and therefore did not provide him with *Miranda* warnings. Jewell was not handcuffed, shackled, or restrained, although he was not free to leave the prison complex, and could terminate the conversation at any time. The interview lasted approximately 75 minutes.

{¶10} McNeil met with Jewell again on May 4, 2023, this time at Warren Correctional Institution where Jewell was then housed. Detective Brandon Field accompanied McNeil to this interview.

{¶11} As before, the meeting took place in an office, and Jewell was not physically restrained other than being incarcerated. But prior to this interview, McNeil *Mirandized* Jewell. McNeil also asked Jewell if he could read and write and if he had taken any drugs or alcohol that would prevent him from understanding their conversation. Following Jewell's answers, McNeil provided Jewell with a form prepared by CPD that notified him of his *Miranda* rights and asked Jewell to sign it. McNeil did not explain that Jewell's signature on the form constituted a waiver of rights. After signing the form, Jewell continued the interview, which lasted about 90 minutes.

{¶12} The State submitted audio recordings of McNeil's interviews with Jewell into the record, and the trial court took the matter under advisement.

### B. Jury Trial

{¶13} Jewell's jury trial began on May 14, 2024. Immediately before the start of jury selection, the trial court denied Jewell's motion to suppress.

{¶14} The State called nine witnesses at trial, and Jewell rested without presenting any evidence.

{¶15} The State's first witness was Kenneth Byrne, a CPD police specialist who

responded to the Gray Road shooting on November 21, 2018. Byrne found R.H. unresponsive and unsuccessfully attempted CPR for five to ten minutes.

{¶16} Steven Alexander, a criminalist in CPD's forensic video unit, next testified to items he photographed and recovered at the crime scene. Among these items were shell casings from a Winchester 9 mm Ruger and a gun he test-fired and determined to be inoperable.

{¶17} The State also called the manager of a group home for adults with developmental disabilities located on Cedar Road. R.H. had been a resident of the group home for approximately two years at the time of the shooting. The group home manager identified security camera footage from the night of the shooting that depicted R.H. While the footage displayed an incorrect timestamp, the manager explained that a third-party had installed the security cameras. The State intimated that perhaps the clock was set to central time.

{¶18} A member of the family that owns Shaker's Night Club also testified. Shaker's is located at the corner of Hamilton and Cedar near the group home. The Shaker's owner identified surveillance footage from Shaker's from the day of the shooting, and the footage was admitted into evidence.

{¶19} The State further called Dorothy Dean, a forensic pathologist and deputy coroner, as an expert witness. Dean examined R.H.'s body and determined his death to be a homicide. In her opinion, R.H. was fatally wounded by gunshot wounds to his torso and right lower extremity. Dean testified that all of the bullet entrance wounds were on the front of R.H.'s body, except one that was on his side. She was unable to ascertain how far away the gun was from R.H.'s body when he was shot.

{¶20} Both Alexis and Michael Hill testified against Jewell. For her part,

Alexis[1] admitted that she had also been charged with R.H.'s murder and denied receiving a benefit for her testimony.

{¶21} Alexis met Jewell through her brother Michael in July 2018, while Jewell and Michael were incarcerated together. Alexis and Jewell began dating in September 2018 while Jewell was still in prison. Alexis described Michael and Jewell's relationship as close. All three—Michael, Jewell, and Alexis—lived at Alexis's apartment after Michael and Jewell were released.

{¶22} The day of the shooting, Alexis and Jewell were at the apartment when Michael arrived, stating he had been robbed. Michael spoke erratically and paced back and forth in the living room. He said he knew who robbed him but never identified the person.

{¶23} Jewell then told Alexis to drive all three of them in her car. Initially Alexis refused and attempted to walk away, but Jewell pointed a gun at her head and again told her to drive. Alexis admitted that she owned a black 9 mm gun she had purchased at a gun show, although she could not remember the brand. The gun that Jewell pointed at her head was her own gun. Alexis was scared for her life, so she ultimately agreed to Jewell's plan.

{¶24} Alexis owned a black Mazda, and Michael was driving a rental car at the time. Jewell suggested they take Alexis's car because its windows were tinted black. Alexis was the driver, Michael was in the passenger seat, and Jewell was in the backseat. Alexis drove from the apartment to an address on Cedar Road, under Michael and Jewell's direction. As Alexis drove, Jewell retained possession of Alexis's 9 mm gun. Alexis also saw Michael with a different gun in the car.

---

[1] Because Alexis and Michael share a last name, we use their first names to eliminate confusion.

**{¶25}** Once they arrived on Cedar Road, Alexis pulled into the parking lot across from Shaker's. Jewell got out of the vehicle and approached R.H., whom Alexis had never seen before. Alexis asked Michael what was going on, but he did not reply.

**{¶26}** Alexis then saw Jewell and R.H. walk down the street and into a building. When she lost sight of them, she pulled out of the Shaker's lot and headed in their direction. But she was never able to see where they went so she returned to the parking lot.

**{¶27}** Jewell eventually came back and got in the backseat. He directed her to leave the parking lot and drive up Cedar. As they approached a white house, Jewell told her to stop. R.H. came out of the house, and Jewell said to him, "Old school, let me holler at you." R.H. then got in the backseat of the car with Jewell.

**{¶28}** Through her rearview mirror, Alexis saw Jewell brandish a gun to R.H. Jewell then asked R.H. about the location of the man who robbed Michael, as did Michael. R.H. said that he did not know.

**{¶29}** Jewell instructed Alexis to pull into an apartment parking lot on Gray Road. Jewell then told R.H. to get out of the car, following him out. Alexis did not drive away because Jewell had a gun, and she was scared. Jewell and R.H. walked towards a wooded area, and Alexis heard multiple shots. Jewell then returned to the vehicle alone and told Alexis to drive away. According to Alexis, Michael never got out of the vehicle. After the shooting, Alexis drove the group back to her apartment. When they arrived, Michael left in his car, and Jewell left in his car.

**{¶30}** Shortly after the shooting, Alexis told Jewell she no longer felt comfortable driving her black Mazda. On November 21, 2018, Jewell took Alexis to Maaco to have the vehicle painted. Although the Maaco receipt was in Alexis's name, Jewell paid for the repair, and Alexis picked the new color.

**{¶31}** Alexis moved out of the apartment that she shared with Jewell and Michael in December 2018. She had broken up with Jewell by this point.

**{¶32}** In May of 2021, Alexis received what she perceived to be a threat from Jewell through the prison email system. She spoke with McNeil three or four times about R.H.'s murder beginning in 2022. She initially denied involvement and also failed to mention that Jewell threatened her with a gun to coerce her to drive. Eventually Alexis ended up telling McNeil what happened to R.H.

**{¶33}** Michael Hill, who went by the nickname "Beans," testified to a similar version of events, although Michael's testimony differed from his sister's in some key respects. For one thing, Michael disputed Alexis's contention that he was close with Jewell. Michael only considered Jewell an associate. He also testified that Jewell did not stay the night at Alexis's apartment and did not live with her.

**{¶34}** Michael explained that, in November 2018, he made money by selling drugs, primarily methamphetamine and cocaine. On the day of R.H.'s murder, Michael received a call from a customer who wanted to buy drugs. He attempted to fulfill the order but was robbed. He then sought Jewell's assistance in addressing the robbery, as it occurred in Jewell's neighborhood.

**{¶35}** Michael went to Alexis's apartment, where he described the robber to Alexis and Jewell. Jewell indicated that he knew who the robber was. Michael then drove the three of them—himself, Alexis, and Jewell—to the scene of the robbery. Once there, Michael and Alexis switched seats in the car, and Alexis became the driver. Michael contended that he did not have a gun and neither did Jewell.

**{¶36}** Jewell noticed R.H. on the street and got his attention. R.H. asked if he could get a ride. R.H. then got in the car, sat behind Alexis, and asked to be dropped off at an apartment down the street. Michael told Jewell that R.H. was not the robber

and that he had never seen R.H. before.

**{¶37}** As they drove, Jewell asked R.H. about the robbery, but R.H. said he did not know anything about it. When they arrived at the apartment where R.H. asked to be dropped off, R.H. got out of the car, and Jewell followed. Michael could see the two talking but could not hear what they were saying. Micheal then heard gun shots. Jewell got back into the front passenger seat with a black gun in his hand.

**{¶38}** They then drove back to Alexis's apartment. Michael got into his rental vehicle and left. Neither Michael nor Alexis called the police because they were afraid of Jewell.

**{¶39}** Some time later, Michael and Jewell were housed at Madison Correctional Institution together. While at Madison, Jewell repeatedly told Michael that he and Alexis needed to stay quiet about what happened. Michael also received threats from Jewell while in jail waiting to testify at trial.

**{¶40}** At the time of his testimony, Michael was serving a five-year sentence for distribution of drugs and drug trafficking. He had previously served time at FMC Lexington, a federal facility. Michael had also been convicted of a state drug-trafficking charge, for which he had served time at the Madison and London correctional centers. Michael admitted that he would not have testified against Jewell if he were not also charged with R.H.'s murder.

**{¶41}** The State next called Bryan Wellinghoff, a former investigator at Ross Correctional Institution. Wellinghoff testified that he relayed a message from Jewell to McNeil that Jewell wanted to speak to a Hamilton County detective about a crime.

**{¶42}** The State's final witness at trial was McNeil. He explained his initial involvement with R.H.'s homicide and how the case remained unsolved prior to Jewell's request to speak with him.

**{¶43}** McNeil described receiving a call on September 14, 2022, indicating that Jewell, then an inmate at Ross, wanted to speak with him. McNeil met with Jewell at Ross the following day. When he arrived, Jewell seemed pleased that he was there. At the time of this initial meeting, Jewell was not considered a suspect in R.H.'s murder.

**{¶44}** McNeil authenticated, and the State played, the audio of Jewell's September 15, 2022 interview. In it, Jewell indicated that he was familiar with R.H. and his killing. He also said that he knew Beans and previously dated Beans's sister Alexis. Jewell believed that Beans was accusing him of being involved in R.H.'s murder, which prompted him to contact detectives. Jewell told McNeil that Beans had been robbed the day that R.H. was shot and sought his assistance. In a search for the robber, Jewell and Beans confronted several individuals Jewell suspected of being involved, but nothing came of the encounter. Later that night, Jewell was at a location on Cedar Road, when Beans called him to say he had located the robber. At the same time, Alexis also called to indicate she intended to kill someone on Gray Road. Before Jewell could intervene, he heard shots. He believed Michael killed the victim. Jewell then went to Alexis's apartment to change shoes because he was going to a club that night. Alexis later painted her black car blue at Maaco. Alexis had also purchased a gun at the Sharonville Convention Center, but Jewell did not know what became of it.

**{¶45}** Following his first interview with Jewell, McNeil spoke with Alexis. The first time he asked her about R.H.'s murder, she denied involvement. But she later contacted McNeil's office to indicate that her cell phone might ping in the area of the shooting.

**{¶46}** Before McNeil could schedule a follow-up interview with Alexis, Jewell reached out to him again, this time from Warren Correctional Institution. He now considered Jewell a person of interest and interviewed Jewell for a second time. An

audio recording of McNeil's second interview with Jewell was played for the jury.

**{¶47}** The interview began with McNeil reading Jewell his *Miranda* rights and executing a rights notification form. McNeil then confronted Jewell with the allegation that Beans committed the murder. Jewell indicated that he wanted a benefit for sharing information with McNeil, but McNeil could not make any promises. He could only relay information. Jewell continued the interview nonetheless.

**{¶48}** Jewell repeated his version of events surrounding R.H.'s murder. McNeil then showed Jewell a depiction of the Shaker's parking lot taken at 9:51 p.m. on the night of the murder. Jewell agreed that both he and R.H. were present in the depiction and admitted that he handed R.H. drugs during the interaction.[2] But when the depiction advanced to 9:52 p.m., Jewell denied that the person in the image was him. Instead, Jewell continued to assert that Michael was responsible for the shooting. At the conclusion of the interview, McNeil informed Jewell that his statement materially differed from the others and that the case was scheduled to be presented to a grand jury.

**{¶49}** McNeil's testimony resumed after the recording of Jewell's second interview was played. McNeil acknowledged that the timestamps on the surveillance footage from R.H.'s group home were off by an hour. But he could not explain why.

**{¶50}** At the conclusion of McNeil's testimony, defense counsel moved for acquittal under Crim.R. 29. The motion was denied.

**{¶51}** Before the case was submitted to the jury, the trial court heard arguments as to the jury instructions. The State sought a complicity instruction, but Jewell objected on the grounds that he had not been charged with complicity. In

---

[2] Because the State only presented an audio recording of McNeil's interview with Jewell, it is unclear if he showed Jewell a video or photo of Shaker's.

response, the State argued that a charge of principal liability included complicity and that it was within the jury's province to assess whether Jewell acted as principal or as an accomplice. The trial court agreed with the State and overruled Jewell's objection.

**{¶52}** On May 23, 2024, the jury returned a verdict of guilty on all counts against Jewell. The trial court later sentenced him to an aggregate prison sentence of 32 years to life.[3]

### *Analysis*

**{¶53}** On appeal, Jewell raises five assignments of error. First, Jewell asserts that the statements he gave police violated his right against self-incrimination and should have been suppressed. Second, he argues that he received ineffective assistance of counsel because his motion to suppress did not cite the Ohio Constitution as a basis for relief. Third, he contends that the trial court abused its discretion when it gave the jury a complicity instruction. Fourth, he contends that the trial court failed to properly admonish the jury during separation. Lastly, Jewell argues that his murder conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. Each of Jewell's assignments of error lacks merit.

### *Motion to Suppress*

**{¶54}** Jewell's first assignment of error takes issue with the trial court's denial of his motion to suppress. Jewell contends that his first interview with McNeil violated his right against self-incrimination because he was incarcerated and was therefore entitled to *Miranda* warnings before speaking with a detective. He further argues that his second interview with McNeil violated the Fifth Amendment because McNeil failed to warn him that executing the rights notification form could be considered a waiver

---

[3] For purposes of sentencing, the trial court merged Counts 2, 4, and 5 with Count 1.

of his privilege against self-incrimination.

**{¶55}** Our review of the trial court's decision to grant or deny a motion to suppress presents a mixed question of law and fact. *State v. Currie*, 2025-Ohio-670, ¶ 23 (1st Dist.). The trial court is in the best position to evaluate credibility and determine the facts; therefore, we accept the factual findings of the trial court as long as they are supported by credible and competent evidence. *Id.* We review the trial court's legal conclusions in the context of a suppression motion de novo. *Id.*

**{¶56}** With regard to Jewell's first interview, Jewell is correct that a suspect must be *Mirandized* before being subjected to a custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 467-471 (1966). But the fact that Jewell was in prison is not by itself sufficient to establish that he was in custody. *See, e.g., State v. Barker*, 2017-Ohio-596, ¶ 11 (5th Dist.). Rather, the inquiry into whether an incarcerated person is subject to a custodial interrogation focuses on all the features of the interview, not merely the fact that the interviewee is in prison. *Howes v. Fields*, 565 U.S. 499, 514 (2012). These include "(1) the location of the questioning, (2) its duration, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning." *State v. Nelson*, 2016-Ohio-7115, ¶ 24 (6th Dist.).

**{¶57}** Looking at the September 15, 2022 interview in its totality, Jewell was not subjected to a custodial interrogation. Critical to that determination is the fact that Jewell initiated the interview by asking to speak to McNeil. Jewell thus invited the conversation, and he remained free at all times to conclude it. The interview took place in an investigator's office, not a cell or other coercive location, and Jewell was neither handcuffed nor shackled. The meeting lasted just over an hour, and Jewell did most of the talking. At no point did he attempt to stop or leave the room, and no point

was McNeil hostile or threatening in his questioning.

**{¶58}** Under these circumstances, we cannot say that Jewell was in custody. Rather, Jewell made a voluntary confession as to his knowledge of R.H.'s murder. "Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Howes* at 514. Because his confession was voluntary, and because he was not subjected to a custodial interrogation, Jewell was not entitled to *Miranda* warnings during his first interview.

**{¶59}** Nor did Jewell's implied waiver of his *Miranda* rights in his second interview present any Fifth Amendment problems. We assess whether Jewell knowingly, intelligently, and voluntarily waived his rights under a totality-of-the circumstances test. *State v. Durgan*, 2018-Ohio-2310, ¶ 21 (1st Dist.). Under this test, courts consider "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." (Cleaned up.) *State v. Jackson*, 2022-Ohio-2562, ¶ 32 (1st Dist.). It is the State's burden to prove by the preponderance of the evidence that the waiver was knowingly, intelligently, and voluntarily made. *Id.* at ¶ 33. "Absent evidence that an accused's will was overborne or his capacity for self-determination was critically impaired because of coercive police conduct, a waiver of *Miranda* rights will be considered voluntary." *Id.*

**{¶60}** An accused may waive his *Miranda* rights either expressly or by inference. *Id.* at ¶ 36. Where waiver is inferred, a suspect's behavior and the circumstances surrounding the interrogation can be taken into account to determine whether the suspect knowingly, voluntarily, and intelligently waived his *Miranda* rights. *Id.* A suspect's decision to continue to speak with police after receiving

*Miranda* warnings can constitute a form of inferred waiver. *Id.*

**{¶61}** The totality of the circumstances in this case indicate that Jewell knowingly, voluntarily, and intelligently waived his self-incrimination rights in speaking with McNeil a second time. Before interviewing Jewell, McNeil read Jewell his rights and presented him with a rights notification form. Jewell expressly indicated that he understood his rights, signed the form acknowledging them, and began discussing R.H.'s murder immediately thereafter. Jewell also attempted to bargain with McNeil for a benefit in his case in exchange for his participation in the interview, exhibiting awareness of the legal system and its intricacies. Under these circumstances, we infer that Jewell waived his *Miranda* rights when he acknowledged that he understood his rights and continued to speak with McNeil nonetheless.

**{¶62}** Jewell's first assignment of error is accordingly overruled.

### *Ineffective Assistance of Counsel*

**{¶63}** In his second assignment of error, Jewell argues that defense counsel rendered ineffective assistance of counsel by failing to cite the Ohio Constitution as an independent basis for his suppression motion. Relying on our opinion in *State v. Morris*, 2023-Ohio-4105 (1st Dist.), he contends that the state Constitution affords broader protection than the federal Constitution in suppressing un-*Mirandized* statements.

**{¶64}** To succeed on a claim of ineffective assistance of counsel, Jewell must prove that (1) trial counsel's performance was deficient, and (2) counsel's deficient performance prejudiced his ability to receive a fair trial. *State v. Akins*, 2024-Ohio-1491, ¶ 45 (1st Dist.). "[T]o show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been

different." *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989).

**{¶65}** Jewell cannot show that his motion to suppress would have been resolved in his favor had his trial attorney relied on the Ohio Constitution, and the lack of prejudice is fatal to his ineffective-assistance claim. It is true that, in *Morris*, we expanded the protections afforded by the Ohio Constitution to a suspect who is represented by counsel at the time of a custodial interrogation. *See Morris* at ¶ 55. But there is no evidence that Jewell was represented by counsel at the time of either interview with McNeil. Thus, even had Jewell's counsel relied upon the Ohio Constitution, *Morris* would not have controlled.

**{¶66}** Jewell points to no other authority suggesting that the Ohio Constitution offers broader protection to unrepresented suspects than the Fifth Amendment or that it compels the circumstances of a custodial interrogation to be analyzed any differently. In the absence of any case law supporting his argument, Jewell has failed to show how he was prejudiced by his attorney's exclusive reliance on the federal Constitution. Jewell's second assignment of error is therefore overruled.

### *Complicity Instruction*

**{¶67}** In his third assignment of error, Jewel challenges the trial court's insurance of a jury instruction on complicity. In support of his position, he points to a perceived lack of evidence that he aided and abetted Michael and Alexis, instead highlighting the State's theory was that he was the principal actor.

**{¶68}** We review a trial court's jury instructions for an abuse of discretion. *State v. Bush*, 2010-Ohio-2874, ¶ 13 (1st Dist.).

**{¶69}** By statute, the State may charge an offender under either a theory of complicity or in terms of principal liability. *See* R.C. 2923.03(F). Where the evidence permits it, the statute places a defendant on notice that he may be convicted under

either approach. *See State v. Jones*, 2018-Ohio-4754, ¶ 43 (1st Dist.). Thus, if the State presents evidence that the defendant acted in concert with another person while committing the alleged crime, a complicity instruction is proper. *Id.*

**{¶70}** The evidence presented at trial supported a complicity instruction in Jewell's case, and the trial court therefore acted within its sound discretion in instructing the jury. Both Michael and Alexis testified to their involvement in R.H.'s murder. Both claimed to have driven to the scene of the crime and to have facilitated Jewell's escape. Alexis admitted that Jewell used her gun and that the two went together to a Maaco store after the shooting to disguise her car by painting it. Michael described involving Jewell in seeking retribution for a robbery he experienced earlier in the day while selling drugs. Given this testimony, the jury could have reasonably concluded that Jewell was the principal actor by shooting the victim and that Alexis and Michael aided and abetted him in the shooting. The jury also could have concluded that Jewell aided and abetted Alexis and Michael in carrying out the crime.

**{¶71}** R.C. 2923.03(F) permits alternative theories of culpability in cases where the evidence supports both complicity and principal liability. This is such a case. Jewell's third assignment of error is overruled.

### *Jury Admonishments*

**{¶72}** In his fourth assignment of error, Jewell takes issue with the trial court's instructions to the jury during breaks. The trial court informally advised the jury not to discuss the case while the evidence was still being presented, but it did not formally deliver the admonishments required by R.C. 2945.34. Because Jewell failed to object to the trial court's admonishments, we review this alleged error under a plain-error standard of review. *State v. Helm*, 2016-Ohio-500, ¶ 24 (1st Dist.). To demonstrate plain error, Jewell must show, among other factors, that the error affected the outcome

of the trial. *State v. Gordon*, 2018-Ohio-259, ¶ 23.

**{¶73}** Pursuant to R.C. 2945.34, a trial court must instruct the jury during breaks in a trial "not to converse with, nor permit themselves to be addressed by any person, nor to listen to any conversation on the subject of the trial, nor form or express any opinion thereon, until the case is finally submitted to them." A trial court should fully comply with the statutory requirement and admonish the jury according to its terms. *Helm* at ¶ 25. However, the failure to issue the required instructions does not require reversal on appeal. *Id.* This is because the statute provides no remedy for noncompliance. *Id.*

**{¶74}** Immediately following jury selection, the trial court stated to the jury,

I'll also ask you to please do not have any discussions with anybody about what you are hearing in here, not with each other, not with family members or so forth. It's okay to say you're on jury duty, but don't give any facts about this case you heard today or who the defendant is, any of that, simply because it keeps your head clear so you can come in here and give the State and the defendant your fullest attention possible.

**{¶75}** Preceding subsequent breaks, the trial court only reminded the jury not to discuss the case. The trial court did not provide any of the other admonishments required by R.C. 2945.34.

**{¶76}** This was improper. *See Helm*, 2016-Ohio-500, at ¶ 25 (1st Dist.). The trial court should have given a complete admonishment to the jury every time they separated. But, applying the plain-error standard, Jewell cannot demonstrate that the trial court's failure to provide complete R.C. 2945.34 admonishments affected the outcome of his trial. There is no evidence that jury misconduct or bias resulted from the lack of statutory admonitions or that the jury's verdict was impacted in any way by

the trial court's informality.

**{¶77}** We accordingly overrule Jewell's fourth assignment of error.

### *Sufficiency and Manifest Weight of the Evidence*

**{¶78}** In his fifth assignment of error, Jewell argues that his conviction for R.H.'s murder was not supported by sufficient evidence and was against the manifest weight of the evidence. Specifically, Jewell argues that the State did not prove beyond a reasonable doubt that he was the shooter or that he was complicit in R.H.'s murder.

**{¶79}** To determine whether a conviction is supported by sufficient evidence, we inquire "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Curry*, 2020-Ohio-1230, ¶ 11 (1st Dist.).

**{¶80}** When considering a challenge to the weight of the evidence and all reasonable inferences, the court must consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A verdict can be set aside as against the manifest weight of the evidence even though supported by legally sufficient evidence. *State v. Myers*, 2018-Ohio-1903, ¶ 140. In assessing a manifest-weight challenge, the court reviews the entire record, weighs the evidence and all reasonable inferences, and considers the credibility of all witnesses. *State v. McKelton*, 2016-Ohio-5735, ¶ 328.

**{¶81}** After review, the court must consider whether the jury clearly lost its way in resolving conflicts in the evidence and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Wilks*, 2018-Ohio-1562, ¶ 140. Unlike a sufficiency review, a manifest-weight challenge does not require the court to

view evidence in a light favorable to the prosecution. *State v. Plymale,* 2016-Ohio-3340, ¶ 26 (4th Dist.).

**{¶82}** R.C. 2903.02(A) states that "[n]o person shall purposely cause the death of another or the unlawful termination of another's pregnancy." Jewell challenges the evidence that supported his identity as the person who caused the death of R.H. He contends that the only evidence against him was the testimony of Michael and Alexis, which he argues was contradictory and unreliable.

**{¶83}** Jewell is incorrect as to the nature of the evidence against him. Numerous sources of evidence identified Jewell as the person who shot and killed R.H. Both Michael and Alexis testified that they saw R.H. and Jewell leave the car. After they heard shots, only Jewell returned to the car. Independent evidence corroborated Michael's and Alexis's accounts. For one, Jewell himself admitted to being at the scene and described similar events. For another, Jewell and R.H. were depicted on surveillance video taken at R.H.'s group home sometime shortly before the shooting. And a receipt from Maaco confirmed that Alexis painted her car shortly after the incident. Thus, sufficient evidence demonstrated that Jewell murdered R.H.

**{¶84}** Jewell argues that discrepancies between Alexis's and Michael's testimony rendered them not credible. To be fair, there were some inconsistencies between the Hill siblings' stories (i.e., who was driving, whether Michael had a gun). But their testimony was more similar than it was different. Both Alexis and Michael testified that Michael was robbed earlier in the day and that after he was robbed, he sought help from Jewell. Both testified that the group drove together to the location of the robbery and that R.H. got into their car. They both testified that Jewell exited from the car with R.H. at the murder scene and that Jewell had a gun. And they both testified that the only person out of the vehicle with R.H. when he was shot and killed

was Jewell.

**{¶85}** The jury also heard Jewell's interviews with McNeil, in which Jewell corroborated Michael's and Alexis's stories in significant ways. First, Jewell acknowledged trying to assist Michael in addressing the robbery. He also admitted to being with Michael and Alexis on Gray Road and to selling drugs to R.H. on the night of the incident. And he knew that R.H. was shot with a 9 mm gun. Notably, Dean testified that the fatal shots to R.H. came from a 9 mm firearm.

**{¶86}** Considering Jewell's statements, the Maaco receipt, the surveillance footage, and the testimony of Michael, Alexis, and Dean, we cannot say that the jury clearly lost its way and created a manifest weight of injustice. The State presented evidence to show that Jewell was complicit in the murder. The jury was free to interpret the evidence to conclude that Jewell committed the murder and/or aided and abetted the murder.

**{¶87}** Jewell's fifth assignment of error is hereby overruled.

### *Conclusion*

**{¶88}** Jewell's challenges to his convictions are without merit and are overruled. We accordingly affirm the judgment of the trial court.

Judgment affirmed.

**BOCK** and **MOORE, JJ.,** concur.